In re Naomi M. TAUBMAN, d/b/a Taubman Realty Co., d/b/a Certified Realty Co., d/b/a Naomi M. Taubman, P.A., Debtor.

Bankruptcy No. 3–89–01642.

Adv. Nos. 3–92–0022, 3–92–0029, 3–92–0050, 3–92–0054, 3–92–0057, 3–92–0061, 3–92–0065, 3–92–0070, 3–92–0082, 3–92–0092, 3–92–0093, 3–92–0094, 3–92–0096, 3–92–0097, 3–92–0098, 3–92–0100 and 3–92–0102.

United States Bankruptcy Court,
S.D. Ohio, W.D.

Oct. 25, 1993.

As Corrected Nov. 16, 1993.

John Paul Rieser, pro se.

Deborah D. Hunt, Peter Donahue, Dayton, OH, for William and Barbara Niswonger, Eva Shane, Thomas Peterson and Sarah Jane Peterson, James and Mary Leach and J & M Management.

Donald F. Harker, III, Dayton, OH, for Jerald Lieber and Dorothy Stefandis.

Ronald S. Pretekin, Mary E. Ming, Dayton, OH, for John and Donna Venema.

Thomas Whiteside, Nashville, TN, for Mary Peelle.

Frank Thermes, Miamisburg, OH, Donald Burton, David Shough, Dayton, OH, for Diane Frey.

Michael J. Long, Kettering, OH, for Henry Gottwald, Belva Estes, Frima and Samuel Abramowitz and Daniel Taubman.

Robert L. Moore, Dayton, OH, for Winfred L. Smith and Nellie Jo Smith.

Ira Rubin, Dayton, OH, for Don Frisby.

Daryl R. Douple, Dayton, OH, for Phyllis Stout.

Theodore Gudorf, Dayton, OH, for Martin Taubman, Brenda Taubman, and Stanley Taubman.

John Squires, Dayton, OH, for Harold Taubman.

Paul H. Spaeth, Dayton, OH, for James and Matilde Taguchi.

Bradley C. Smith, Dayton, OH, for J.R. Gunter and Aileen Gunter.

Dalma C. Grandjean, Dayton, OH, for Dale E. Holycross.

**DECISION ON ORDER GRANTING MOTION OF TRUSTEE FOR PARTIAL SUMMARY JUDGMENT AS TO COMMON ISSUES IN THE ESTATE CASE CONCERNING ALL PROOFS OF CLAIM AND THE ADVERSARY PROCEEDINGS LISTED ABOVE AND DETERMINING THIS ORDER IS A FINAL ORDER PURSUANT TO FED.R.BANKR.P. 7054**

THOMAS F. WALDRON, Bankruptcy Judge.

## TABLE OF CONTENTS

| | | Page |
|---|---|------|
| I. | PRELIMINARY STATEMENT | 969 |
| II. | BACKGROUND | 969 |
| III. | FACTS | 972 |
| IV. | DISCUSSION | 974 |

A. Summary Judgment ..... 974
B. Common Issues ..... 978
 1. Ponzi Scheme ..... 978
 2. Insolvency ..... 979
 3. Separation of All Individual Investor/Lender Proofs of Claim Into A/B Claims ..... 980
 4. Avoidance of False Profits ..... 982
 a. Transfer/Conveyance of Property of the Debtor ..... 982
 b. Actual Intent to Defraud ..... 983
 (1) 11 U.S.C. § 548(a)(1) ..... 983
 (2) O.R.C. § 1336.07 ..... 984
 c. Constructive Fraud ..... 984
 (1) 11 U.S.C. § 548(a)(2)(A)–(B)(i)–(iii) ..... 984
 (a) Reasonably Equivalent Value ..... 985
 (i) Insolvent ..... 986
 (ii) Unreasonably Small Capital ..... 986
 (iii) Intent to Incur Debts Beyond Ability to Pay ..... 986
 (b) 11 U.S.C. § 548(c) ..... 987
 (2) Uniform Fraudulent Conveyance Act—O.R.C. §§ 1336.04, 1336.05, and 1336.06 ..... 987
 (a) Fair Consideration ..... 988
 (i) Insolvent ..... 988
 (ii) Unreasonably Small Capital ..... 988
 (iii) Intent to Incur Debts Beyond Ability to Pay ..... 988
 5. Uniform Fraudulent Conveyance Act and Not the Uniform Fraudulent Transfer Act is the Applicable Law and a Specific Statute of Limitations is Not a Bar ..... 989
 a. Applicable Law ..... 989
 b. A Specific Statute of Limitations Does Not Bar the Trustee's Claims ..... 989
 6. The Ordinary Course of Business Defense is Not Applicable to 547 Preference Claims ..... 990
V. DETERMINATION PURSUANT TO FED.R.BANKR.P. 7054 ..... 991
VI. CONCLUSION ..... 992

## I. PRELIMINARY STATEMENT

This proceeding, which arises under 28 U.S.C. § 1334(b) in a case referred to this court by the Standing Order of Reference entered in this district on July 30, 1984, is determined to be a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B), (F), (H), and (O).

Presently before the court is a motion for partial summary judgment filed by the chapter 7 trustee ("Trustee"). The Trustee requests that the court determine, as a matter of law, common issues in all adversary proceedings pending before the court and with respect to each creditor who filed a proof of claim.

## II. BACKGROUND

On May 3, 1989, Naomi M. Taubman (the "Debtor") filed for relief under chapter 11 of the Bankruptcy Code. On January 18, 1990, this case was converted to one under chapter 7. John Paul Rieser was appointed as the chapter 7 Trustee. On or about January 17, 1992, the Trustee initiated approximately eighty adversary proceedings alleging similar, but not identical, claims against a large

number of defendants. In general, these complaints seek recovery of amounts arising out of prepetition investments with the Debtor in which these defendants received amounts in excess of the amounts originally invested. The Trustee has alleged alternate theories of recovery pursuant to 11 U.S.C. §§ 544, 547, 548, and 550, as well as under various provisions of state law. The gravamen of the Trustee's complaints is that the Debtor was engaged in a "ponzi" scheme. Additionally, the Trustee seeks to bifurcate all proofs of claim, including those of investors not named as defendants in any of the pending adversary proceedings. The Trustee proposes to separate the proofs of claim into an "A" claim and a "B" claim. The "A" claim would represent, on a cash-in/cash-out basis, the difference, if any, between what an investor actually invested, lent, or gave to the Debtor, *minus* the total he or she received back at any time. The "B" portion would consist of all profit, interest, return of principal, punitive damages, multiple damages, or any amount in excess of actual pecuniary loss.

To facilitate the determination of issues present in many of these adversaries and in the estate case concerning proofs of claim, the Trustee filed a Motion And Report Of Trustee Re Proposed Consolidation Of Adversaries For Determination Of Common Issues Of Law And Fact. Some, but not all, of the defendants filed responses to the Trustee's motion. Pursuant to an order entered in the adversary proceedings, the court held a hearing in connection with the Trustee's motion concerning "common issues" and, thereafter, considered individual issues in connection with each specific adversary proceeding. Upon consideration of all responses filed and all oral arguments presented, the court granted the Trustee's motion. In accordance with this determination, the court fixed filing dates for the Trustee to file a motion and accompanying memorandum in support of his positions concerning common issues and for any responses to be filed, and to hear oral argument.

With respect to the issues involving parties who filed proofs of claim, the court entered an Order Establishing Procedures And Filing Requirements Governing Partial Determination Of Proofs Of Claim Issues, Setting Pretrial Conference, And Requiring Notice (Doc. 499–1). This order noted that although the Trustee filed his motion regarding the proposed consolidation of adversaries for determination of common issues of law and fact in the estate case, it was served only upon defendants in various adversary proceedings. Therefore, to allow parties who filed a proof of claim to receive notice of the Trustee's positions and requests for determinations in connection with all proofs of claim, the Trustee was ordered to file with the court and serve upon all parties filing a proof of claim in which the Trustee asserted there were common issues of law and fact, a motion and accompanying memorandum in support of the Trustee's positions. Response and reply dates were also established, and a date for oral argument and for a pretrial conference was set.

In order to allow all parties an extended period for discovery and research, the dates in each of these orders were subsequently vacated and new dates were established. The entry of these orders as to all "common issues" was a necessary step as part of the special procedures adopted to manage these potentially difficult and protracted actions involving complex issues, multiple parties, difficult legal questions, and unusual proof problems. Fed.R.Bankr.P. 7016.

On August 5, 1993, the Trustee filed a motion for partial summary judgment in all pending adversary proceedings and in the estate case.[1] In this motion the Trustee requests that the court determine the proposed common issues including, whether: 1) the Debtor was engaged in a Ponzi scheme from at least January 1, 1978 to May 3, 1989, 2) the Debtor was insolvent continuously from at least January 1, 1978 to May 3, 1989, 3) the proofs of claim should be separated into two portions, an "A" claim, representing on a cash-in/cash-out basis the difference, if any, between what an investor actually invested, lent, or gave to the Debtor, *minus* the total he or she received back at any time, and a "B" portion which would consist of all

1. Currently, seventeen adversaries remain pending before the court.

profit, interest, return of principal, punitive damages, multiple damages, or any amount in excess of actual pecuniary loss, 4) the Trustee may avoid all transfers in excess of a defendant's original investment, referred to as "false profits," within one year of the petition pursuant to 11 U.S.C. § 548 and whether the Trustee can set aside certain conveyances under 11 U.S.C. § 544, applying various provisions of the Uniform Fraudulent Conveyance Act, 5) the Uniform Fraudulent Conveyance Act is applicable law and not the Uniform Fraudulent Transfer Act and a specific statute of limitations does not bar the Trustee under the Uniform Fraudulent Conveyance Act, and 6) 11 U.S.C. § 547(c)(2) is not a defense to the Trustee's § 547 claims.[2]

In support of his partial motion for summary judgment, the Trustee attached various exhibits including: the affidavit of Phyllis Stout ("Stout Affidavit"), a former employee of the Debtor; the affidavit of Nellie Poling ("Poling Affidavit"), also a former employee of the Debtor, which has several exhibits attached including: several sample "invest-

ment agreements/promissory notes/receipt-acknowledgments" used by the Debtor (Exs. 1A–1G); excerpts from contemporaneous ledger books kept by the Debtor (Exs. 2A–2D); back-up ledgers/check detail for "blue sheet" re-cap prepared in 1989 by the Debtor and staff (Exs. 3A1–3D); a Grand Summary (the "Grand Summary"), a document submitted by the Debtor in prior adversary proceedings to show all deposits and disbursements from all debtor activities from 1980–1990 (Ex. 4); an excerpt from one bank account for the month of February, 1988 showing the deposit of funds from creditor Albert Hollis and the use of these same funds (Ex. 5); and a "Blue Sheet," entitled "Summary Of Annual Loans & Return of Capital From 1978 through 5/03/89," which was prepared by the Debtor and her staff in 1989 and is a re-cap of all lender/investor cash in/out through 1978–1989 (Ex. 6) and; the affidavit of a certified public accountant, Elizabeth Winters Waite, CPA ("Waite Affidavit" or "Waite"),[3] which has several exhibits attached including: Waite's resume (Ex.

**2.** The Trustee states that, by filing the current motion, he specifically reserves the right to raise all fact-specific claims including, for example, claims of lack of good faith and actual fraud in a specific case involving a specific defendant or claimant where applicable, irrespective of the court's determination of common issues which assumes good faith for purposes of establishing general factual and legal parameters for all proceedings.

**3.** Waite states that she reviewed the following documents: 1) schedules and statement of financial affairs filed by the Debtor, 2) federal income tax returns for Naomi Taubman and Daniel Taubman, For Taubman & Taubman, a Partnership (Terrace Ridge Apartments), and for M & T Enterprises 1980–1988; 3) 2004 deposition transcripts of Naomi Taubman, Volumes I, II, III, and IV dated July 2, 1990, July 2, 1990, August 24, 1990 and December 17, 1990 respectively, 4) binders of proofs of claim filed by creditors in this case containing in many cases, agreements/notes and/or payment ledgers, 5) the Debtor's contemporaneous ledger books showing her investor activities with a record of amounts paid and monthly payment histories or accruals for each investor, 6) a sample of check records, including bank statements and canceled checks of the Debtor as produced by her, 7) the Blue Sheet—i.e., the Debtor's handwritten "Summary of Annual Loans and Return of Capital from January 1, 1978, through May 3, 1989" which is a spreadsheet of receipts and disbursements to

investors completed during the Chapter 11, 8) a sample of individual investor backup/detail sheets for the "Blue Sheet," excerpts of which are attached as Exhibits 3A1, 3B, 3C, and 3D to the Nellie Poling Affidavit, 9) answers to interrogatories for several of the individual creditors sampled by Waite showing their payment detail for comparative purposes with that of the Debtor, 10) records of operations of Terrace Ridge Apartments, including various ABC Reports, 11) Regulatory Agreement for Terrace Ridge Apartments between Taubman & Taubman and the U.S. Department of Housing and Urban Development, 12) U.S. Trustee Form I showing recap of all scheduled assets of the Debtor and their disposition as filed by the Trustee with various Interim Reports with the court, 13) Grand Summary submitted to the Trustee by the Debtor in 1991 (Poling Exhibit 4), along with the separate "tracking" backup detail provided by the Debtor re: Grand Summary, excerpts of which are Exhibit 5 to the Poling Affidavit, 14) affidavit of Nellie Poling in support of the Trustee's motion for partial summary judgment, together with exhibits attached thereto, excerpted from the foregoing groups of records, 15) affidavit of Phyllis Stout in support of Trustee's motion for partial summary judgment, and 16) certified copies of the Debtor's criminal conviction and affirmance on appeal, together with the opinion of the Ohio Court of Appeals, attached hereto as Exhibit 8. Waite further states that she had unrestricted access to all deposition exhibits to the Debtors' 2004 examinations.

7), the decision of *State v. Taubman*, 78 Ohio App.3d 834, 606 N.E.2d 962 (1992) (Ex. 8), a worksheet regarding the Grand Summary data (Ex. 9), and a worksheet regarding tax return data (Ex. 10).

With respect to the adversaries currently pending before the court, the following defendants (the "defendants") filed a response: William and Barbara Niswonger (Doc. 60–1), 3–92–0022; Mary Peelle (Doc. 77–1), 3–92–0054; Diane Frey (Doc. 84–1), 3–92–0057; Eva Shane (Doc. 60–1), 3–92–0065; Daniel Taubman (Doc. 54–1), (document misfiled in 3–92–0070), 3–92–0098; Tom and Jane Peterson (Doc. 62–1), 3–92–0092; Brenda Taubman, Martin Taubman, Stanley Taubman (Doc. 102–1), Harold Taubman (Doc. 94–1), and Naomi Taubman (Doc. 107–1), 3–92–0094; Mary Leach (Doc. 57–1), 3–92–0096 and; James and Matilde Taguchi (Doc. 64–1), 3–92–0097.[4]

With respect to the estate case, the following creditors who filed a proof of claim (the "claimants") filed a response: Herbert and Bonnie Anderson (Est.Doc. 556–1), Dorothy A. Weaver (Est.Doc. 555–1), Walter E. Meyhofer (Est.Doc. 552–1), Provident Bank (Est. Doc. 547–1), and Ohio Savings Bank (Est. Doc. 550–1).

The Trustee filed replies to the various defendants' and claimants' responses.

In accordance with the court's previous order, the following defendants filed a request for oral argument: Harold Taubman, Brenda Taubman, Martin Taubman, and Stanley Taubman, all defendants in 3–92–0094, and Mary Peelle a defendant in 3–92–0054. In the estate case the following claimants requested oral argument: Provident Bank (Est.Doc. 547–1), Dorothy Weaver (Est.Doc. 555–1), and Ohio Savings Bank (Est.Doc. 550–1).[5]

## III. FACTS

Based upon the Waite Affidavit, the Poling Affidavit, the Stout Affidavit, all the affidavits attached to the responses filed by defendants in the adversary proceedings and the creditors in the estate case, and the various attached exhibits, the court finds the following:

1. The Debtor executed standard forms of agreement and promissory notes ("Investment Agreements") with her investors. (Waite Aff. at p. 9; Poling Aff., Exs. 1A–1G). The typical Investment Agreement provided that the Debtor would have the sole discretion in investing the principal and that the investor would receive monthly payments for as many months as was necessary to equal the original principal. These payments were characterized as return of principal by the Debtor. Once the principal was returned in full, the investor was to receive another amount equal to the principal. This payment amount was characterized as "interest" by the Debtor. Waite Aff. at pp. 9–10. The typical Investment Agreement provided for a monthly return equal to an interest rate of between 12% and 24%, but usually in the range of 15% to 18% per annum. Waite Aff. at pp. 9–10.

2. The Debtor did not segregate the funds received by the investors. Instead, all investor and lender funds were deposited into any number of then current bank accounts, denominated in any of the several names of the Debtor's various accounting, real estate and personal accounts together with those of her husband. These funds were transferred, in whole or in part, in various ways, including, but not limited to, cash or cashier's checks. When funds were received from a new investor, or received or retained from an existing investor, these funds were used to pay the required monthly payments and payments of principal to earlier investors. Waite Aff. at pp. 12–15. All funds were used to pay monthly payments and principal returns for prior investors and to pay the Debtor's living expenses and business-related expenses, such as payroll, rent,

---

**4.** On September 23, 1993, the Taguchis filed a Motion For Leave To File Response To Reply Of Trustee (Doc. 66–1) with a copy of their reply attached. At the hearing set for oral argument on October, 19, 1993, the court granted the Taguchis motion and allowed the reply to be filed as of September 23, 1993 (Doc. 68–1). The court

notes that it has considered all arguments presented in the Taguchis' reply.

**5.** The court heard oral arguments on October 19, 1993.

interest payments on bank notes, and the like. Waite Affidavit at p. 11.

3. Over 200 individuals invested approximately ten million dollars with the Debtor from January 1, 1978 to the date of the bankruptcy filing on May 3, 1989. Waite Aff. at p. 13. In return, these investors received, collectively, approximately 7.5 million to 8.8 million dollars, leaving a shortfall of between 1.5 and 2.5 million dollars. Waite Aff. at p. 13.

4. Of the two hundred plus investors listed on the Blue Sheet, approximately fifty investors received the total amount of their principal in full, or received an amount in excess of the principal amount invested. Waite Aff. at p. 15. Few investors were actually "paid in full" under the Investment Agreements because they did not receive all monthly payments plus the original principal in full as promised. Waite Aff. at p. 15. A significant minority of investors received no return, or only a few dollars back on their investment. Waite at p. 15. Approximately fifty individuals, over forty of whom invested from and after January, 1988, invested over $900,000.00 with the Debtor and received absolutely no return of any part of their money. Waite Aff. at pp. 15–16.

5. There were no assets of any magnitude and no profits from any of the Debtor's businesses to contribute a material amount, if any at all, to the repayment of investor monies. Waite Aff. at p. 11. Other than the monies received from new investors, no source of funds, including any or all of the Debtor's legitimate businesses, was sufficient to repay these investors. Waite Aff. at p. 20.

6. The Debtor prepared many tax returns and gave her opinion that these investments were "tax free" which had the effect of inducing a large number of investors to sign up for this program since it equated to an after-tax return well in excess of 20% per annum. Most investors were told that their monthly payments and accruals were "tax free" since they were denominated as return of principal. Investors were encouraged to roll over their accounts, rather than receive taxable "interest" at the end of the original term so that they could continue to receive "tax free" monthly payments. Waite Aff. at p. 10. In addition, the Debtor induced investors into her scheme by allowing them to add additional amounts and request return of principal prior to the expiration of the original scheduled time.

7. One of the hallmarks of a "classic" ponzi scheme is that later investors receive less of a return than investors who get in early. The relatively lengthy time period of this Debtor's ponzi scheme resulted because most investors continued to invest and reinvest their money with the Debtor as their initial terms expired, and continued to invest amounts in addition to their original investments. Unlike many other reported ponzi schemes, which grow quickly and explode shortly thereafter when the required payments to earlier investors cannot be maintained, this Debtor was able to keep the entire scheme alive for a longer period of time through this mechanism of reinvestment and rollovers, significantly reducing her required repayment to early investors. Early investors were induced to extend the terms of their investments rather than receive their principal back, thereby, in effect, granting the Debtor continuing unsecured, long-term loans, for which the minimum required payments were easier to meet than the required payment of the larger lump sum principal. If the Debtor had actually paid the lump sum principal amounts pursuant to the terms of her original agreements for periods beginning in 1978, rather than inducing reinvestment and rollovers, the scheme would have ended much earlier.

8. The Debtor was engaged in a ponzi scheme from at least January 1, 1978 to May 3, 1989, the petition date.

9. Schedule A of the Schedules and Statement of Financial Affairs filed by the Debtor sets forth total debts of $8,228,202.00 and Schedule B sets forth total property in the amount of $5,969,938.00. Waite Aff. at pp. 21–22. These figures calculate to equal a negative net worth of $2,258,263.00 as of the petition date on May 3, 1989.

10. The Schedules and listed values of assets demonstrate that even the stated negative net worth of approximately 2.25 million dollars is predicated upon a significant over-

statement of asset values and a gross understatement of liabilities. The filed proofs of claim in this case total in excess of twenty-two million dollars, not inclusive of undetermined or contingent amounts. Eliminating duplicate amounts still results in filed proofs of claim in excess of eleven million dollars. A spot review of the proofs of claim demonstrate that some, but not all, individual creditors/investors filed for the full contractually-promised amount under their agreements with the Debtor. Thus, it is an appropriate inference that, if anything, the filed non-duplicative proofs of claim in excess of eleven million dollars state a more accurate total of the amount of the Debtor's actual liabilities rather than the 8.2 million dollars listed.

11. At a "fair valuation," the Debtor's total actual assets are not the six million dollars stated, but are at most worth 2.5 to three million dollars.

12. The actual negative net worth of the Debtor at a fair valuation as of the filing date and of her affiliated businesses, is in the range of *negative* five to eight million dollars.

13. A review of tax records, real estate records regarding purchases and dispositions, as well as an analysis of the Debtor's Grand Summary (Poling Ex. 4), all demonstrate that this gross deficiency, when calculated backward from May 3, 1989 to January 1, 1978, was never erased completely from the Debtor's records. Waite Aff. at p. 22.

## IV. DISCUSSION

A. Summary Judgment

In 1986, the Supreme Court gave new life to summary judgment practice. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Scholars and courts are in agreement that a 'new era' in summary judgments dawned by virtue of the Court's opinions in these cases." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476 (6th Cir.1989) (footnote omitted).

On the whole, these decisions reflect a salutary return to the original purpose of summary judgments. Over the years, decisions requiring denial of summary judgment if there was even a suggestion of an issue of fact had tended to emasculate summary judgment as an effective procedural device.

*Id.* (footnote omitted).

 Federal Rule of Bankruptcy Procedure 7056 incorporates Federal Rule of Civil Procedure 56(c) and sets forth the general standards for the issuance of summary judgment. It provides, in pertinent part, as follows:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

Fed.R.Civ.P. 56(c). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson,* 477 U.S. at 247, 106 S.Ct. at 2510 (emphasis in original). The party seeking summary judgment bears the initial burden of establishing, in light of the pleadings, depositions, answers to interrogatories, admissions, and affidavits, the absence of a genuine issue of material fact. The ultimate burden of demonstrating the existence of a genuine issue of material fact, however, lies with the non-moving party. *Celotex,* 477 U.S. at 321–325, 106 S.Ct. at 2552–53.

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a *genuine issue for trial.*" Fed.R.Civ.Proc.

56(e) (emphasis added). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no "genuine issue for trial." *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1356 (citations omitted; footnote omitted).

Examining the effect of *Anderson, Celotex,* and *Matsushita*, the Sixth Circuit reached the conclusion that these three decisions establish at least the following principles in new era summary judgment practice:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing the "absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6. As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

*Street,* 886 F.2d at 1479–80 (footnotes omitted).

Rule 56(d) provides for partial summary judgment where judgment is not rendered upon the whole case or for all the relief requested and some issues, or the application of the partial summary judgment ruling, remain for further determination. The Trustee's motion is for partial summary judgment under Rule 56(d) because the Trustee is only seeking a ruling in his favor on common issues and not a determination of the exact liability of each defendant or any party who filed a proof of claim. It is important to note that the determination of these common issues establishes the law of the case,[6] eliminates a number of pending issues, and has binding effect in all future proceedings in this case; however, this determination will not, in itself, result in a specific determination of all of the causes of action or all of the defenses in a specific proceeding.

---

**6.** The doctrine of the law of the case posits that when a court determines a rule of law, that decision should continue to govern the same issues in subsequent stages of the same case. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 814, 108 S.Ct. 2166, 2177, 100 L.Ed.2d 811 (1988). "This rule of practice promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.'" *Id.* (quoting 1B J. Moore, J. Lucas, & T. Currier, Moore's Federal Practice para. 0.404[1], p. 118 (1984)).

As previously listed, a number of the remaining defendants and claimants filed responses to the Trustee's motion. A large number of these responses focus on issues requiring specific fact and issue determinations relevant only to the specific circumstances of an individual proceeding. The Trustee's motion only involves "common issues"; therefore, the responses requiring specific fact and issue determinations are not relevant to this determination. Notwithstanding, the court notes that it has considered all pleadings, evidence, and arguments of all parties and counsel, whether or not specifically noted by name in this decision. The court has, by separate order, denied various documents requesting relief filed by the Debtor. Most responses, whether pertaining to facts or issues specific to a proceeding or not, merely contain allegations and do not have documents supporting the allegations as required pursuant to Rule 56(e). Certain defendants, however, submitted documents in accordance with Rule 56(e), Frey (Adv. No. 3–92–0057), the Taguchis (Adv. No. 3–92–0097), and Peelle (Adv. No. 3–92–0054).

Defendant Diane Frey asserts that the Trustee has not met his burden under Rule 56(c) in establishing that the Debtor was engaged in a ponzi scheme or was insolvent because the affidavits submitted by the Trustee in support of his motion for partial summary judgment are inadmissible under the Federal Rules of Evidence. Frey contends that Poling and Stout have limited knowledge and are therefore, "unqualified bystanders."

■ Poling and Stout are lay witnesses. With respect to lay witnesses, Fed.R.Evid. 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

The Stout and Poling Affidavits satisfy the tests under Rule 701. The court finds that both Stout and Poling based their affidavits on their first-hand personal knowledge or observations while employed by the Debtor. Additionally, the court finds their affidavits helpful in determining facts in issue in this proceeding. The Stout and Poling Affidavits satisfy Fed.R.Evid. 701 and are admissible evidence supporting the Trustee's motion.

■ With respect to Waite, Frey concedes that Waite is an expert witness; however, Frey asserts that the Waite Affidavit is inadmissible because it relies on hearsay, specifically the affidavits of Poling and Stout who made statements with respect to subject matter not within the scope of their employment and business records not made in the course of regularly conducted business.[7] Frey also asserts that Waite relies on unauthenticated documents.

Without determining the correctness of these assertions of inadmissibility, the court notes that, "[a]lthough it once was the rule of evidence in federal courts that expert opinion testimony could not be based on inadmissible hearsay, that is no longer the law nor has it been since the adoption of the Federal Rules of Evidence in 1975." *Kingsley Assocs., Inc. v. Del–Met, Inc.*, 918 F.2d 1277, 1286 (6th Cir.1990). Federal Rule of Evidence 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by *or made known to the expert at or before the hearing.* If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, *the facts or data need not be admissible in evidence.*

(Emphasis added). Therefore, as long as such facts or data are of the type reasonably relied upon by experts, they may include hearsay or other inadmissible evidence. *Kingsley,* 918 F.2d at 1287. As stated by the

---

7. The response of Mary Peelle in adversary proceeding 3–92–0054 raises a similar argument. Peelle asserts that reliance on the Blue Sheet by Waite is misplaced because the document was not made contemporaneously with any of the alleged investments or loans to the Debtor and was created by the Debtor during her litigation with the Trustee. (Doc. 77–1, p. 6).

Sixth Circuit in *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 853 (6th Cir.1981):

> It is clear that there was an adequate basis for his opinion within the meaning of Rule 703. He relied upon studies, his own experience in dynamic testing, his background as bio-mechanical engineer, and upon literature and information furnished him by plaintiff's attorney. *The fact that much of this was hearsay which would probably not be admitted into evidence has nothing to do with the case.* The question is whether it is the type of material that an expert would rely upon, and there is no showing in this record that it is not. In fact, it was the type of material that expert witnesses often rely upon in forming opinions.

(Footnote omitted; emphasis added). Frey has made no showing that any of the items relied upon by Waite are not of the type that experts in her field rely upon. Accordingly, the court concludes that the Waite Affidavit is admissible. Specifically, Waite's conclusions which are the only conclusions of an expert in connection with these common issues are admissible.

■ Frey has also attached an affidavit to her response opposing the Trustee's motion. The Frey affidavit provides, in relevant part:

> It was my perception that the various businesses that Naomi Taubman was involved in were separate enterprises, and it is my understanding that she conducted these various businesses, prior to the time she began as my accountant in 1971, and through the time that she acted as accountant for me, until approximately 1989.
>
> As I have indicated previously in this affidavit, it was my perception that she had been successful in business and in businesses that seemed to be prosperous and ongoing for over twenty (20) years. I would judge that she could not have existed for that period of time in these various businesses without having made significant profits from each of them. I know that she made significant profits in regard to the transactions in which I was involved.

She received accounting fees, management fees, real estate commissions, etc.

(Doc. 84–1).

As previously stated, to create a genuine issue for trial the non-moving party must come forward with specific facts. *Id.; see also Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 862–63 (6th Cir.1986). Frey's general "perceptions" and beliefs, unsupported by specific evidence, are insufficient to create a factual dispute in this proceeding.

■ Frey also asserts that the common issues must be determined in a class action and to handle this proceeding otherwise is in contravention of her rights. This contention is without merit. Following full notice to all creditors and a specific hearing to consider this issue, the court granted the Trustee's motion to determine, in a single proceeding, all common issues deemed applicable to all pending adversary proceedings and proofs of claim. The court notes that Frey did not object to this motion, nor has any party filed any post-order motions or an appeal of the court's order.

■ With respect to the affidavit attached to the Taguchis' response, the court finds that the affidavit sets forth facts specific only to their proceeding, but does not create a genuine issue of material fact with regard to the common issues. The Taguchis further assert that summary judgment is inappropriate because the discovery cutoff has been continued. This court has previously held that Fed.R.Civ. 56(f) allows a summary judgment motion to be denied if the nonmoving party has not had the opportunity to make full discovery, *see Talbot v. Warner (In re Warner),* 65 B.R. 512, 517 (Bankr.S.D.Ohio 1986) (citing *Celotex,* 477 U.S. at 324–327, 106 S.Ct. at 2554–55); however, the discovery cutoff was extended by the Trustee, not by the Taguchis. Further, the Taguchis themselves have not requested continued discovery. Given the initial and extended discovery periods in connection with these issues, and in the absence of any claimed or demonstrated prejudice, the Taguchis cannot successfully assert that they have been denied the appropriate opportunity for full discovery.

Finally, Mary Peelle attached a portion of her deposition to her response opposing the Trustee's motion. The deposition sets forth facts specific to only her proceeding, but fails to create an issue of fact with respect to common issues.

Upon consideration of the foregoing, the court determines that no genuine issues of material fact exist as to the common issues, the only subject of this decision.

### B. Common Issues

#### 1. *PONZI SCHEME* [8]

■ The Trustee asserts that the Debtor, individually and through her affiliated businesses, engaged in a "ponzi" scheme whereby investors and lenders were paid monthly payments, interest, profits, return of capital, or other returns, not from any real investments, but were repaid from money taken from other investors or lenders' investments or loans to the debtor. The Trustee asserts that the ponzi scheme was in effect continuously from at least January 1, 1978 to May 3, 1989, the petition date in this proceeding.

In general, a ponzi scheme is a fraudulent investment arrangement in which returns to investors are not obtained from any underlying business venture but are taken from monies received from new investors. *Danning v. Bozek (In re Bullion Reserve of North America)*, 836 F.2d 1214, 1219 n. 8 (9th Cir. 1988), *cert. denied*, 486 U.S. 1056, 108 S.Ct. 2824, 100 L.Ed.2d 925 (1988); *Merrill v. Abbott (In re Independent Clearing House Co.)*, 41 B.R. 985, 994 n. 12 (Bankr.D.Utah 1984), *aff'd in relevant part*, 62 B.R. 118 (D.Utah 1986). *See Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924); *Conroy v. Shott*, 363 F.2d 90 (6th Cir.1966), *cert. denied*, 385 U.S. 969, 87 S.Ct. 501, 17 L.Ed.2d 433 (1966). Typically, investors are promised high rates of return, *Independent Clearing House*, 41 B.R. at 994 n. 12, and initial investors obtain a greater amount of money from the ponzi scheme than those who join the ponzi scheme later. As a result of the absence of sufficient, or any, assets able to generate funds necessary to pay the promised returns, the success of such a scheme

guarantees its demise because the operator must attract more and more funds, which thereby creates a greater need for funds to pay previous investors, all of which ultimately causes the scheme to collapse. The promised rates of return, because they are in excess of any real investments, render a ponzi scheme operator insolvent from the inception of the scheme. As the scheme progresses and more and more investors are promised returns, the operator becomes more insolvent. *See Cunningham*, 265 U.S. at 7, 44 S.Ct. at 425.

Several defendants in this proceeding assert that if the court finds a ponzi scheme to exist, it should find that the Debtor's other activities, including her accounting practice and real estate activities, are not part of the ponzi scheme but are legitimate business activities. These defendants further assert that the Trustee has not presented evidence demonstrating why legitimate activities should be considered as part of an illegitimate scheme.

The defendants' arguments are not persuasive. The uncontroverted evidence demonstrates that the Debtor was engaged in a ponzi scheme continuously from January 1, 1978 to May 3, 1989. To operate this scheme, the Debtor induced investors, including those she knew from all her business activities, to participate by promising high rates of return and representing to them that they would receive favorable real estate transactions and favorable tax treatment. Funds received by the Debtor from these investors were not segregated into any separate accounts; but, instead, these funds were deposited into any of the Debtor's unrestricted accounts and commingled without distinction with other funds held by the Debtor. Likewise, without distinction, the Debtor expended these funds using them to pay promised returns and personal and business-related expenses, including payroll, rent, and interest payments on bank notes. Funds paid to prior investors were not financed by any business ventures or from any other "legitimate" source but were financed from new investors' monies. Notably, no investment of any magnitude and no profits from any of

8. This common issue applies to all adversaries and all proofs of claim.

her businesses existed to contribute a material amount, if any at all, to the repayment of investor monies. As of the filing date, the net worth of the Debtor was in the range of negative five to eight million dollars (−$5,000,000—$8,000,000). This gross deficiency, when calculated backward from the filing date to January 1, 1978, was never erased completely. Furthermore, although very few investors were repaid their funds in full, the evidence shows that later investors received smaller returns than investors who invested earlier.

The evidence conclusively demonstrates that the Debtor was engaged in a ponzi scheme. This ponzi scheme was in effect and continuously operating from at least January 1, 1978 to May 3, 1989, the petition date.

### 2. INSOLVENCY [9]

The Trustee asserts that the Debtor was insolvent continuously from at least January 1, 1980, and more likely than not from January 1, 1978, to the date of the petition pursuant to 11 U.S.C. § 101(32) and O.R.C. § 1336.02(A)(1) and on a "balance sheet basis."

■■■■ 11 U.S.C. § 101(32), in relevant part, provides:

"[I]nsolvent" means—

(A) with reference to an entity other than a partnership, and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title[.]

Thus, insolvency is essentially a balance sheet test—that is, a debtor is insolvent when the debtor's liabilities exceed the debtor's assets, excluding the value of preferences, fraudulent conveyances, and exemp-

tions. *Foreman Indus., Inc. v. Broadway Sand & Gravel (In re Foreman Indus., Inc.),* 59 B.R. 145, 149 (Bankr.S.D.Ohio 1986). The determination of whether a debtor was insolvent is factual. *Id.* The plaintiff bears the burden of proof with respect to the issue of insolvency under 11 U.S.C. § 548 and the relevant provisions of the Uniform Fraudulent Conveyance Act. *Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.),* 124 B.R. 984, 998 (Bankr.S.D.Ohio 1990); *Cellar Lumber Co. v. Holley,* 9 Ohio App.2d 288, 224 N.E.2d 360, 362 (1967).

O.R.C. § 1336.02 of the Uniform Fraudulent Conveyance Act [10] contains a similar definition of insolvent, providing, in relevant part:

A person is insolvent when the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

O.R.C. § 1336.02. This definition was more fully explained in *Cellar Lumber Co. v. Holley,* 9 Ohio App.2d 288, 224 N.E.2d 360, 363 (1967).

Legal insolvency refers to the situation where the entire assets of an individual are insufficient to pay his debts. A broader concept, originating with merchants or traders, is equitable insolvency, or the inability to pay debts as they become due in the ordinary course of business. Equitable insolvency is employed in Section 1336.06, Revised Code. The definition in Section 1336.02 goes one step further. It also includes the debtor who, although presently meeting his obligations as they become due, has incurred unmatured debts to such an extent that it is apparent he will not be able to meet them when they become absolute and matured. This is determined by considering the present "fair salable value" of his assets, and comparing that with the amount of his "probable liability on his existing debts as they become absolute and matured."

---

**9.** This common issue applies to all adversary proceedings and all proofs of claim.

**10.** A more complete discussion of the court's determination that the Uniform Fraudulent Conveyance Act is applicable law appears in common issue number five.

(Citations omitted). *Accord Toledo Trust Co. v. Poole (In re Poole)*, 15 B.R. 422, 429 (Bankr.N.D.Ohio 1981).

The burden of proof on the issue of insolvency in connection with this common issue rests with the Trustee. Based on the documents submitted by the Trustee, particularly the Waite Affidavit, which contains expert opinion that it is more likely than not that the Debtor was continuously insolvent from at least January 1, 1978 through May 3, 1989, to which no contrary evidence, nor any contrary expert opinion was presented, the court concludes that the Debtor was, pursuant to 11 U.S.C. § 101(32) and O.R.C. § 1336.02, continuously insolvent from at least January 1, 1978 through May 3, 1989.

### 3. *SEPARATION OF ALL INDIVIDUAL INVESTOR/LENDER PROOFS OF CLAIM INTO A/B CLAIMS* [11]

■ The Trustee asserts that, pursuant to 11 U.S.C. §§ 105, 502, 510, and 726, and without regard to whether or not a claimant had knowledge of the Debtor's ponzi scheme, and without regard to whether or not said claimant acted in good faith, investor/lender proofs of claim filed by individual claimants should be separated into two portions: (1) an "A" claim representing the actual pecuniary loss of a claimant, defined as the difference between what the investor/lender gave to the Debtor on a combined basis, *minus* all amounts returned to or for the benefit of that claimant at any time, which is to be classified for distribution purposes as an 11 U.S.C. § 726(a)(2) claim, and (2) a "B" claim representing all promised profit, interest, or other amounts in excess of the amounts actually deposited by the creditor with the Debtor but unreturned, i.e., amounts in excess of actual pecuniary loss, with said "B" claim to be classified for distribution purposes as an 11 U.S.C. § 726(a)(4) claim entitled to payment only on a subordinated basis after all "A" claims have been paid in full. The court notes that the Trustee does not seek to determine the specific amount of any creditor's claim, but merely seeks a decision that estab-

lishes the law of the case with respect to all claims.

■ It is recognized that "there is an overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." *Bank of Marin v. England*, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966). Congressional recognition of these broad equitable principles is reflected in 11 U.S.C. § 105(a), which authorizes a bankruptcy court to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." The Supreme Court continues to recognize that bankruptcy courts, as courts of equity, possess broad authority to modify creditor-debtor relationships. *United States v. Energy Resources Co., Inc.*, 495 U.S. 545, 549, 110 S.Ct. 2139, 2142, 109 L.Ed.2d 580 (1990). It must also be recognized that the exercise of these equitable principles is not unrestricted and cannot "contravene specific provisions of the Bankruptcy Code." *Terex Corp. v. Metropolitan Life Ins. Co. (In re Terex Corp.)*, 984 F.2d 170, 173 (6th Cir. 1993); *Childress v. Middleton Arms, L.P. (In re Middleton Arms, Ltd. Partnership)*, 934 F.2d 723, 724 (6th Cir.1991) (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206, 108 S.Ct. 963, 968–69, 99 L.Ed.2d 169 (1988)). However, in the absence of a prohibitive provision of the Bankruptcy Code, this court remains directed to give overriding consideration to equitable principles. These principles are particularly applicable to creditors' claims to share in the distribution from a bankruptcy estate, since such claim determinations are at the "core of the federal bankruptcy power." *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71, 102 S.Ct. 2858, 2871, 73 L.Ed.2d 598 (1982). Congress' concern for these equitable principles is also evident in the express provisions dealing with claim determinations, see 11 U.S.C. § 502(b)(1), a claim may be determined unenforceable under any applicable law; 11 U.S.C. § 502(j), a claim can be reconsidered for cause and allowed or disallowed according to the equities

---

**11.** This common issues applies in all adversaries and all proofs of claim filed by individual inves-

tors and lenders.

of the case, and; 11 U.S.C. § 510(c)(1), under principles of equitable subordination an allowed claim may be subordinated to all or part of any other allowed claim.

Further, most courts which have considered claim allowance and distributions in ponzi scheme bankruptcy cases, have noted the significance of the unusual circumstances involved in a ponzi scheme and have specifically applied equitable principles to resolve claims distribution issues. The Supreme Court, in *Cunningham v. Brown*, 265 U.S. 1, 44 S.Ct. 424, 68 L.Ed. 873 (1924), held that a ponzi scheme creates circumstances which "call strongly for the principle that equality is equity." Principles of equity were likewise approved by the Fourth Circuit in *Abrams v. Eby (In re Young)*, 294 F. 1 (4th Cir.1923). In *Young*, the bankrupt induced several thousand people to invest their money with him in a "blind pool." The bankrupt, Young, proposed to invest the money in a common fund for the purpose of buying and selling securities traded on the New York Stock Exchange. As compensation for his services, Young was to receive one-third of each customer's net profits. Young's legitimate investments were not profitable, but, nonetheless, Young reported "false profits" and paid these "false profits" from sums deposited by new customers. Separate accounts were maintained by Young for a short time but were soon discontinued, and payments by all customers were placed in a single fund from which "false profits" were distributed.

One of Young's customers, Abrams, had paid over $4,000 into the fund. Abrams received $2,283.02 as profits. At the time he received these profits, Abrams withdrew $2,000 of his supposed principal and his former receipt was canceled and a new receipt was issued for $2,000, as if the sum had been paid in cash. Afterwards, Abrams received $513.80 as profit on this $2,000. Therefore, Abrams received back the entire $4,000 he put in and $796.90 in addition. Abrams filed a claim in Young's bankruptcy for $2,000 and asserted that he should share equally with the claims of the victims who had either received back none of the money they put in, or had only received a part of it.

In reaching its decision, the court noted that "equity requires the application of the rule of equality," *Id.* at 3, and concluded:

[I]t is to be borne in mind that there were no profits, and that all the payments made by Young were from the capital fund paid in by customers. Every cent paid to Abrams as profits was taken from the capital contributed by his coadventurers.

We have, then, a common enterprise, a common fund, contributed by all the customers, a manager common to all, his breach of trust common to all, losses common to all. It follows that all sums paid as profits to one adventurer from the common fund, when there was no profit, was an unjust enrichment of that adventurer from the fund belonging to all in common, sufficient to pay but a small dividend on the capital sums actually paid in. Equity therefore requires that he should account for all sums paid to him as profit before he can share with others in the application of the funds on hand to the debts due for sums actually paid in.

*Id.* at 4. *Accord Official Cattle Contract Holders Committee v. Commons (In re Tedlock Cattle Co., Inc.)*, 552 F.2d 1351 (9th Cir.1977).

In this proceeding, the Debtor was insolvent continuously from January 1, 1978 through May 3, 1989 and during this time frame was engaged in a ponzi scheme. In classic ponzi scheme fashion, prior investors were paid with newer investors' money; and, consequently, prior investors received more money and received this money at newer investors' expense. In such circumstances, to allow any investor to recover promised returns in excess of the original amount invested would be to further the Debtor's fraudulent scheme at the expense of other investors, particularly newer investors. An investor in a ponzi scheme is not only a victim but at the same time is a perpetrator, for without the continual influx of new funds the scheme quickly collapses and the Debtor is unable to perpetuate the scheme and create harm to new creditors. Further exacerbating this inequitable situation is the fact that in this bankruptcy, all available evidence indicates that no distribution will be made to

"B" claims, and the extent and timing of any distributions to "A" claims is unknown.

Based upon the express equitable powers entrusted to the bankruptcy court, see 11 U.S.C. §§ 105, 502(b)(1), 502(j), and 510(c)(1), and, based upon the foregoing applicable case law, the court concludes that equity dictates that the proofs of claim be split into an "A" portion and a "B" portion. The "A" claim represents on a cash-in/cash-out basis the difference, if any, between what an investor actually invested, lent, or gave to the Debtor, *minus* the total he or she received back at any time. The "B" portion consists of all profit, interest, return of principal, punitive damages, multiple damages, or any amount in excess of actual pecuniary loss. The "B" claims shall receive distribution only after all "A" claims have been paid in full.

Having reached this determination under equitable principles, the court will not address the Trustee's assertions under 11 U.S.C. § 726.

### 4. *AVOIDANCE OF FALSE PROFITS* [12]

The Trustee seeks to avoid all transfers within one year of the petition pursuant to 11 U.S.C. § 548 and to set aside certain fraudulent conveyances pursuant to 11 U.S.C. § 544 incorporating the Uniform Fraudulent Conveyance Act ("UFCA"), O.R.C. § 1336.01 et seq. The Trustee seeks summary judgment under these provisions as to liability only. Further, the Trustee seeks to avoid transfers pursuant to 11 U.S.C. § 548 and the UFCA only for amounts received by a defendant that are in excess of that defendant's original investment, amounts designated by the Trustee as "false profits."

### a. Transfer/Conveyance Of Property Of The Debtor

▆▆▆ The Trustee asserts that the payments by the Debtor to her ponzi scheme investor/lenders by checks, cash payments, cashier's checks, or by the transfer of other property, including the conveyance of real

estate, as well as the incurrence of obligations pursuant to the promissory notes and agreements constitute a "transfer" within the meaning of the Bankruptcy Code and a "conveyance" within the meaning of the UFCA.

Section 101(58) [54] provides:

"[T]ransfer" means every mode, direct, or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption[.]

Section 1336.01(B) of the UFCA provides:

"Conveyance" includes every payment of money, assignment, release, transfer, lease, mortgage, or pledge of tangible or intangible property, and also the creation of any lien or encumbrance.

"Funds obtained from investors in a 'Ponzi' scheme are property [of the debtor], and are susceptible of preferential and fraudulent disposition as other property." *Independent Clearing House Co.*, 41 B.R. at 999. As the bankruptcy court in *Rafoth v. First Nat'l Bank (In re Baker & Getty Fin. Services, Inc.)*, 98 B.R. 300 (Bankr.N.D.Ohio 1989) stated:

When a debtor obtains money by fraud and mingles it with other money so as to preclude any tracing and when the defrauded party ... accepts benefits under his contract with the debtor, the money is 'property' of the debtor within the meaning of Sections 547 and 548 of the Code.

98 B.R. at 306 (quoting *Merrill v. Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843, 853–54 (D.Utah 1987)).

Applying the foregoing, the payments made by the Debtor to her ponzi scheme investor/lenders by checks, cashier's check, or by transfer of other property, including real estate conveyances as well as the incurrence of obligations pursuant to promissory notes and agreements, constitute "transfers" within the meaning of 11 U.S.C. § 101(58)

---

**12.** This issue applies only to the following adversaries: 3–92–0093, Estes, et al.; 3–92–0094, Abramowitz, et al.; 3–92–0096, Leach; 3–92–0022, Niswonger; 3–92–0098, Dan Taubman; 3–92–0070, Winfred Smith; 3–92–0050, Venema; 3–92–0100, Gunter; 3–92–0029, Leiber; 3–92–0057, Frey; 3–92–0097, Taguchi; 3–92–0065, Shane; 3–92–0092, Peterson; 3–92–0102, Holycross; 3–92–0061, Gottwald; 3–92–0082, Frisby; 3–92–0054, Peelle.

██ and "conveyances" within the meaning of O.R.C. § 1336.01(B) of the UFCA.

### b. Actual Intent To Defraud

 The Trustee asserts that because of the nature of the Debtor's ponzi scheme it is appropriate to conclude that the payments to other creditors or entities were made with actual intent to hinder, defraud or delay within the meaning of 11 U.S.C. § 548(a)(1) and O.R.C. § 1336.07(1).

### (1) Section 548(a)(1)

Section 548(a)(1) provides:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted[.]

Thus, under § 548(a)(1), the Trustee must demonstrate that: 1) there was a transfer of an interest of the debtor in property, 2) the transfer occurred within one year prior to the date of the filing of the petition, and 3) the transfer was made with the actual intent to hinder, defraud, or delay. The Trustee established a transfer of an interest of the Debtor in property and, in connection with § 548, is only seeking to avoid transfers made within one year prior to the filing date. Accordingly, the Trustee has established his burden with respect to the first two elements. The remaining element to be proved is that the transfer was made with actual intent to hinder, delay, or defraud any entity to which the debtor was or became indebted on or after the date that such transfer was made. 11 U.S.C. § 548(a)(1).

It is appropriate to find actual intent from the Debtor's active participation in a ponzi scheme. *See Baker & Getty*, 98 B.R. at 308. As the district court stated in *Merrill v.*

*Abbott (In re Independent Clearing House Co.)*, 77 B.R. 843, 860 (D.Utah 1987):

A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, *cf.* Restatement (Second) of Torts § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. *Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.)*, 14 B.R. 637, 643 (Bankr.D.Kan.1981) (intentionally carrying out a transaction with full knowledge that its effect will be detrimental to creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1)).

*See also Conroy v. Shott*, 363 F.2d 90, 91–92 (6th Cir.1966), *cert. denied*, 385 U.S. 969, 87 S.Ct. 501, 17 L.Ed.2d 433 (1966) (given a ponzi scheme, the "question of intent to defraud is not debatable").

 Several defendants assert that the Trustee must prove that the false profits came from a ponzi scheme and not the Debtor's legitimate activities.

To the extent that the defendants' position is a correct statement of the law, the Trustee has succeeded in carrying this required burden. As previously detailed in this decision, the Debtor was conducting what has been properly characterized as a ponzi scheme from at least January 1, 1978. The undisputed evidence establishes that none of the "legitimate" business activities generated sufficient monies to repay investors any money in excess of their original investment and that money to make payments came from new investors. Additionally, it is uncontradicted that the investors' monies were not maintained in distinct segregated accounts but

were continuously commingled in accordance with the Debtor's needs or desires at any given time. None of the numerous defendants, individually or collectively, presented the contrary evidence required by Rule 56 to create a genuine issue of material fact with respect to these issues. The court concludes that the Trustee has established that the false profits came from the Debtor's ponzi scheme and not from the Debtor's legitimate activities and the transfers and conveyances of these continually commingled funds are the proper subjects of avoidance actions by the Trustee under applicable federal and state laws.

■■■■■ Based upon the foregoing, the court concludes that the Trustee has established actual intent to defraud under § 548(a)(1).

(2) O.R.C. § 1336.07

Section 1336.07 provides:

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present or future creditors.

Thus, under § 1336.07, the Trustee must demonstrate that the conveyances were made with actual intent to hinder, delay, or defraud. The Trustee's burden must be met by clear and convincing evidence. *United States v. Berman,* 884 F.2d 916, 921 (6th Cir.1989); *Poole,* 15 B.R. at 431; *McKinley Federal Savings and Loan v. Pizzuro Enterprises, Inc.,* 65 Ohio App.3d 791, 585 N.E.2d 496, 499 (1990). In determining whether such conveyances were made with actual intent, direct evidence of fraudulent intent is not necessary, and in most circumstances is unavailable. *Poole,* 15 B.R. at 431. Consequently, "[d]ue to the difficulty in finding direct proof of fraud, courts of this state began long ago to look to inferences from the circumstances surrounding the transaction and the relationship of the parties involved." *Stein v. Brown,* 18 Ohio St.3d 305, 480 N.E.2d 1121, 1124 (1985). *Accord Berman,* 884 F.2d at 922.

[C]ertain traditionally designated "badges" or indicia of fraud, circumstances which usually or frequently attend a conveyance designed to hinder, delay, or defraud creditors, in concert with other suspicious circumstances, have generally been held to be sufficient to show fraud and invalidate the transfer of property.

*Poole,* 15 B.R. at 431–32.

Considering the foregoing, the court finds its analysis under § 548(a)(1) to be equally applicable under § 1336.07. Therefore, upon consideration of the same uncontroverted facts and applicable decisional authority, including the heightened burden of proof, the court concludes that the Trustee has established actual intent pursuant to O.R.C. § 1336.07 of the UFCA.

c. Constructive Fraud

The Trustee alternatively asserts that 11 U.S.C. § 548(a)(2) and the mirror provisions of the UFCA, (O.R.C. § 1336.04 with § 548(a)(2)(B)(i); O.R.C. § 1336.05 with 11 U.S.C. § 548(a)(2)(B)(ii); O.R.C. § 1336.06 with § 548(a)(2)(B)(iii)), contain a separate basis for liability, to wit: constructive fraud, predicated on insolvency at the time of a transfer, coupled with lack of adequate consideration or good faith transfer.

(1) 11 U.S.C. § 548(a)(2)(A)–(B)(i)–(iii)

■■■■ Section 548(a)(2)(A)–(B)(i)–(iii) is characterized as the constructive fraud provision. It provides:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any

property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

Thus, under § 548(a)(2)(A)–(B)(i), the Trustee must show that the transfers were for less than a reasonably equivalent value which left the debtor insolvent on the date of the transfer or the date the obligation was incurred or became insolvent because of the transfer or obligation. Pursuant to § 548(a)(2)(A)–(B)(ii), the Trustee must demonstrate that the transfers were for less than a reasonably equivalent value which left the debtor with unreasonably small capital for the continuance of a business or transaction. Whether the amount of capital remaining in the hands of the debtor is unreasonably small is a question of fact. *Barrett v. Continental Illinois Nat'l Bank & Trust Co.*, 882 F.2d 1 (1st Cir.1989), *cert. denied*, 494 U.S. 1028, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990) (Uniform Fraudulent Conveyance Act case); *Yoder v. T.E.L. Leasing, Inc. (In re Suburban Motor Freight, Inc.)*, 124 B.R. 984, 994 (Bankr. S.D.Ohio 1990). Lastly, under § 548(a)(2)(A)–(B)(iii), the Trustee must show "more than a chronological relationship between the act of the debtor and the subsequently incurred debt. Proof must be adduced sufficient to justify the conclusion that the debtor's transfer or obligation was contemporaneous with an intent or belief that his subsequent creditors would be injured, *i.e.*, that the debtor would be unable to pay such debts as they matured." *Suburban Motor Freight*, 124 B.R. at 994. It has been determined that the Debtor made transfers to the defendants and the Trustee is only seeking to avoid transfers made within one year before the date of the petition. Thus, the inquiry under § 548(a)(2)(A)–(B)(i)–(iii) is whether the Debtor received less than a reasonably equivalent value for the transfers.

(a) *Reasonably Equivalent Value*

The Trustee must prove that the Debtor received less than a reasonably equivalent value in the exchange. 11 U.S.C. § 548(a)(2)(A). Two requirements must be met. First, the debtor must receive the val-

ue of the transfer. *Suburban Motor Freight*, 124 B.R. at 997. Second, "the value received by the debtor must pass a measurement test; *all* aspects of the transaction must be examined in order to calculate the value of all the benefits and burdens to the debtor, direct or indirect." *Id.* (emphasis in original). Section 548 defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2)(A). "Debt" is defined as "liability on a claim," 11 U.S.C. 101(12), and "claim" includes any "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5).

The Debtor's liability to the defendants arises under the Investment Agreements. Therefore, whether the Debtor was indebted to a defendant for amounts in excess of the original amount invested or loaned depends on whether or not the defendant had a valid, enforceable right under the contract with the Debtor to receive payments in excess of the amount given to the Debtor. *See Independent Clearing House*, 77 B.R. at 857.

In general, courts will not enforce an illegal bargain based upon the " 'elementary principle that one who has himself participated in a violation of law cannot be permitted to assert in a court of justice any right founded upon or growing out of the illegal transaction.' " *Independent Clearing House*, 77 B.R. at 857 (quoting *Gibbs & Sterrett Mfg. Co. v. Brucker*, 111 U.S. 597, 601, 4 S.Ct. 572, 574, 28 L.Ed. 534 (1884)). If a party seeking enforcement of an illegal contract, however, is innocent of any wrongdoing, the rationale for refusing to enforce the bargain does not apply. *Id.* 77 B.R. at 858. Nonetheless,

[I]n some cases "the interest of the public, rather than the equitable standing of individual parties, is of determining importance." ... To allow an undertaker [investor] to enforce his contract to recover promised returns in excess of his undertaking would be to further the debtors' fraudulent scheme at the expense of other undertakers [investors].

*Id.* Consistent with the rationale of these cases, in the circumstances of this bankruptcy case, the provisions of the Investment Agreements are unenforceable to the extent they propose to require payments to the defendants in excess of a defendant's principal investment or loan. Consequently, transfers by the Debtor to a defendant in excess of a defendant's original investment do not satisfy an antecedent debt of the Debtor. *See Independent Clearing House,* 77 B.R. at 858.

A further aspect of this analysis requires discussion, since the transfers could still have been made for "value" if the Debtor received "property" in exchange for the transfers. This aspect is addressed most clearly in *Independent Clearing House,* which states:

> [T]he use of investors' money to perpetuate a Ponzi scheme is not the type of 'property' and hence 'value' Congress had in mind when it passed section 548(a)(2).

> "Value" must be determined by an objective standard. If the use of the defendants' money was of value to the debtors, it was only because it allowed them to defraud more people of more money. Judged from any but the subjective viewpoint of the perpetrators of the scheme, the "value" of using others' money for such a purpose is negative.

> In theory, the trustee is not allowed to avoid transfers made for reasonably equivalent value because creditors are not hurt by such transfers. If the debtor no longer has the thing transferred, either he has its equivalent, in which case his creditors can reach the equivalent to satisfy their claims, or his liabilities have been proportionately reduced. In either case, creditors have not been prejudiced. But if all the debtor receives in return for a transfer is the use of the defendant's money to run a Ponzi scheme, there is nothing in the bankruptcy estate for creditors to share. In fact, by helping the debtor perpetuate this scheme, the transfers exacerbate the harm to creditors by increasing the amount of claims while diminishing the debtor's estate. In such a situation, the use of the defendant's

money cannot objectively be called "reasonably equivalent value."

*Id.* at 859 (citations omitted).

In this case, the Debtor did not receive value in exchange for transfers to the defendants. The Debtor received less than a reasonably equivalent value. These transfers, in whatever form, from the Debtor to the defendants are properly denominated as "false profits."

### (i) Insolvent

As previously determined, the undisputed evidence demonstrates that the Debtor was insolvent at all times from and after at least January 1, 1978 through May 3, 1989, the petition date.

### (ii) Unreasonably Small Capital

The phrase "unreasonably small capital" is not defined in the Bankruptcy Code; thus, an appropriate analysis of this phrase involves examination of the debtor's cash flow and available operating capital. *Suburban Motor Freight,* 124 B.R. at 998. "This analysis requires a court to examine the ability of the debtor to generate enough cash from operations and sales of assets to pay its debts and remain financially stable." *Id.*

The court determines, in the circumstances of this bankruptcy case, that insolvency constitutes unreasonably small capital *per se.*

### (iii) Intent to Incur Debts Beyond Ability to Pay

This prong of § 548(a)(2)(A)–(B) requires the court to undergo a subjective, rather than an objective, inquiry into a party's intent. *Id.* at 1000 n. 14.

The record is silent as to any expressed intention or belief by the Debtor to incur debts beyond her ability to pay; however, the record does offer facts and circumstances from which such an intention may be found.

The undisputed evidence demonstrates that the Debtor was continuously insolvent from at least January 1, 1978 to May 3, 1989 and throughout this time frame was operating a ponzi scheme. The nature of a ponzi scheme renders the operator insolvent from the beginning. No existing assets and no

other source of funds, other than new or future investors' funds, were sufficient to repay prior investors. To acquire the funds to make the promised returns to existing investors, the Debtor induced new investors to provide her with funds or induced existing investors to reinvest or rollover their prior investments, or, in some cases, increase their existing investments, all allowing the Debtor forego paying her existing obligations. Furthermore, funds from new investors were commingled with existing funds in the Debtor's accounts and were used to pay returns to prior investors. The Debtor often lacked the necessary funds to pay monthly bills on a current basis and make payments due investors. Stout Aff. at pp. 8–9. The Debtor frequently bounced checks, and as time passed, increasingly received angry calls and visits from investors. Stout Aff. at p. 8.

As a result of the Debtor's continuous insolvency and operation of a ponzi scheme, the court finds that the Debtor intended to incur, or believed that she would incur, debts beyond her ability to pay such debts as they mature. Although this prong involves a determination of the Debtor's subjective intent, this finding is completely supported by the uncontradicted evidence. *Suburban Motor Freight,* 124 B.R. at 1001 (citing *Street v. J.C. Bradford & Co.,* 886 F.2d at 1480 (cases involving state-of-mind issues are not necessarily inappropriate for summary judgment)).

(b) *Section 548(c)*

 To the extent that any defendant argues that § 548(c) provides a defense to the Trustee's claims, the Trustee asserts this defense is unavailable in this proceeding. Section 548(c) provides:

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of the title, the transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such a transfer or obligation.

This section provides, generally, that even if the payments to the defendants were fraudulent, the defendants are protected, to the extent they gave the Debtor "value" in exchange for transfers, if they received the transfers in "good faith."

> The extent to which a defendant "gave value" for a particular transfer is essentially the flip side of the question we have already discussed under section 548(a)(2), namely, whether the debtor received a "reasonably equivalent value" in exchange for the transfer. What the defendants gave the debtors in exchange for transfers in excess of their undertaking was the use of their money to further a Ponzi scheme.

*Id.* 77 B.R. at 861.

While the defendants may have unknowingly been both victim and perpetrator, knowledge is not a component of the determination of value. As previously noted, what the defendants gave this Debtor in exchange for the transfers was not "value" within the meaning of § 548. "Good faith" on the part of a defendant or claimant is not material to the determination of value, which is an essential element to a defense under § 548(c). Thus, to the extent the Trustee seeks to avoid false profits, § 548(c) does not provide a defense for any defendant.

Therefore, having determined that all elements under § 548(a)(2)(A)–(B)(i)–(iii) have been established, and that § 548(c) does not provide a defense, the Trustee is entitled to summary judgment on this common issue with respect to liability only.

(2) Uniform Fraudulent Conveyance Act— O.R.C. §§ 1336.04, 1336.05, and 1336.06

The Trustee also seeks recovery pursuant to the Uniform Fraudulent Conveyance Act ("UFCA"). Section 1336.04 provides:

> Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

Section 1336.05 provides:

> Every conveyance made and every obligation incurred without fair consideration,

when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

Section 1336.06 provides:

Every conveyance made and every obligation incurred without fair consideration, when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

Thus, under § 1336.04, the Trustee must prove that the conveyances made or the obligations incurred by the Debtor were made while insolvent or which rendered the Debtor insolvent, and were made or incurred without fair consideration. Under § 1336.05, the Trustee must show that every conveyance made or obligation incurred by the Debtor without fair consideration was made when the Debtor had unreasonably small capital. With respect to either § 1336.04 or § 1336.-05, "[n]either the intent of the debtor nor the knowledge of the transferee need be proven." *Spangler v. Redick,* 74 Ohio App.3d 798, 600 N.E.2d 720, 725 (1991); *see Cellar Lumber Co. v. Holley,* 9 Ohio App.2d 288, 224 N.E.2d 360, 362 (1967). Lastly, under § 1336.06, the Trustee must prove that every conveyance made or obligation incurred by the Debtor without fair consideration was made when the Debtor believed she would incur debts beyond her ability to pay as they matured.

■ The Trustee has established that the Debtor made conveyances to the defendants. Thus, the next inquiry necessary for each of these provisions, §§ 1336.04—1336.06, is whether there was "fair consideration."

(a) *Fair Consideration*

Section 1336.03 defines fair consideration, providing:

Fair consideration is given for property, or obligation:

(A) When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied; or

(B) When such property or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property or obligation obtained.

The Trustee is assuming, for the purposes of this motion only, that all defendants and claimants acted in good faith. Nonetheless, even with this assumption, "fair consideration" does not exist. Consistent with the foregoing analysis under § 548 and its subparts, "fair consideration" does not exist for the same reasons that "reasonably equivalent value" under § 548 does not exist. *See Independent Clearing House,* 77 B.R. at 868.

### (i) Insolvent

As previously determined, the uncontroverted evidence demonstrates that the Debtor was insolvent at all times from at least January 1, 1978 to May 3, 1989, the petition date.

### (ii) Unreasonably Small Capital

As this court determined with respect to the determination of whether there was unreasonably small capital under § 548(a)(2)(A)–(B)(ii), the court concludes that in the circumstances of this proceeding, insolvency constitutes unreasonably small capital *per se.*

### (iii) Intent to Incur Debts Beyond Ability To Pay

In accordance with this court's previous discussion with respect to the determination of whether there was intent to incur debts beyond an ability to pay under § 548(a)(2)(A)–(B)(iii), the court concludes that the Debtor intended to incur, or believed that she would incur, debts beyond her ability to pay such debts at they matured.

Therefore, having found that all the elements under the UFCA have been satisfied as to liability, and good faith is not a defense, the Trustee is entitled to summary judgment on this common issue with only individual damage issues remaining to be determined in a specific adversary proceeding.

5. *UNIFORM FRAUDULENT CONVEYANCE ACT AND NOT THE UNIFORM FRAUDULENT TRANSFER ACT IS THE APPLICABLE LAW AND A SPECIFIC STATUTE OF LIMITATIONS IS NOT A BAR* [13]

### a. Applicable Law

 The Trustee asserts that the Ohio Uniform Fraudulent Conveyance Act ("UFCA") and not the Ohio Uniform Fraudulent Transfer Act ("UFTA") is the applicable law for purposes of 11 U.S.C. § 544.

Although the Ohio Supreme Court has not expressly determined the issue of whether the UFTA is to be applied retroactively, the court has addressed the general subject of retroactive application of a statute.

The issue of whether a statute may constitutionally be applied retrospectively does not arise unless there has been a prior determination that the General Assembly specified that the statute so apply. Upon its face, R.C. 1.48 establishes a threshold analysis which must be utilized prior to inquiry under Section 28, Article II of the Ohio Constitution.

*Van Fossen v. Babcock & Wilcox Co.*, 36 Ohio St.3d 100, 522 N.E.2d 489, 491 (1988). O.R.C. § 1.48 provides that "[a] statute is presumed to be prospective in its operation unless expressly made retrospective." *See Van Fossen*, 522 N.E.2d at 495. The UFTA, Ohio Revised Code Chapter 1336, does not contain any provision that expressly gives the statute retroactive application. *Whittaker v. Carmean (In re Carmean)*, 153 B.R. 985, 989 (Bankr.S.D.Ohio 1993). Therefore, the UFTA is not to be given retroactive effect and any transfers occurring before its enactment, on September 28, 1990, are not governed by its provisions. *Id.; Scott v. Fifth Third Bank (In re Carrousel Motels, Inc.)*, 146 B.R. 733, 735 (Bankr.S.D.Ohio 1992).

The Debtor filed for relief under the Bankruptcy Code on May 3, 1989. Therefore, the alleged transfers in this proceeding occurred prior to the enactment of the UFTA, and the UFCA, the predecessor law, is applicable.

### b. A Specific Statute Of Limitations Does Not Bar The Trustee's Claims

 The Trustee argues that he is not time-barred from bringing these causes of action by defenses which include a specific statute of limitations, laches, estoppel, or any other general equitable defenses. Further, the Trustee argues that he is not limited to a "look-back" period of four years from the date of the petition, i.e., the four year period prior to May 3, 1989, and that any defense that transactions or transfers occurring prior to May 4, 1985 are not voidable or recoverable by the Trustee under UFCA, should be determined as a matter of law against the defendants in these adversary proceedings. The Trustee asserts that the court should find his UFCA claims to be timely brought and not subject to any specific time limitations as to transfers that can be avoided, even to the very beginning of the Debtor's ponzi scheme, i.e., at least to January 1, 1978.

Section 2305.09 sets forth the limitations period for bringing causes of action under the UFCA. *See Goldstein v. United States*, No. 1:91CV0969, 1992 WL 402944 (N.D. Ohio Sept. 2, 1992). Section 2305.09(C) provides that an action for relief on the ground of fraud shall be brought within four years after the cause accrued and that the cause shall not accrue until the fraud is discovered. O.R.C. § 2305.09(C).

 The explicit language of the Ohio Supreme Court's syllabus [14] states that the statute of limitations for fraud "does not contemplate a constructive discovery, and the cause of action does not accrue when the fraudulent deed in filed for record *unless the plaintiff then receives actual notice of its execution and of the circumstances which render it fraudulent.*" *Stivens v. Summers*, 68 Ohio St. 421, 67 N.E. 884 (1903) (emphasis

**13.** This issue applies only to the following adversaries: 3–92–0093, Estes, et al.; 3–92–0094, Abramowitz, et al.; 3–92–0096, Leach; 3–92–0022, Niswonger; 3–92–0098, Dan Taubman; 3–92–0070, Winfred Smith; 3–92–0050, Venema; 3–92–0100, Gunter; 3–92–0029, Leiber; 3–92–0057, Frey; 3–92–0097, Taguchi; 3–92–0065, Shane; 3–92–0092, Peterson; 3–92–0102, Holy-cross; 3–92–0061, Gottwald; 3–92–0082, Frisby; 3–92–0054, Peelle.

**14.** Under Ohio law, the syllabus of the Ohio Supreme Court opinion establishes the law of the case. *Star Bank, N.A. v. Reveal (In re Reveal)*, 148 B.R. 288, 290 n. 1 (Bankr.S.D.Ohio 1992).

added). *Accord Burr v. Bd. of County Commissioners of Stark County*, 23 Ohio St.3d 69, 23 OBR 200, 491 N.E.2d 1101 (1986) ("[a] cause of action for the tort of fraud must be brought within four years of the time the cause accrued. The cause does not accrue until the fraud and wrongdoer are actually discovered"). Notwithstanding, counsel for certain defendants have argued that pursuant to a subsequent Ohio Supreme Court case, mere constructive discovery triggers the running of the statute of limitations, *see Investors REIT One v. Jacobs*, 46 Ohio St.3d 176, 546 N.E.2d 206, 206–07 (1989) (the four-year limitations period does not commence to run on claims presented in fraud or conversion until the complainants have discovered, or should have discovered, the claimed matters). *See also Kettering v. Berger*, 4 Ohio App.3d 254, 4 OBR 471, 448 N.E.2d 458, 465 (1982), ("actual discovery, or what might by the exercise of due diligence have been discovered that will cause the statute to begin to run").

The court finds it unnecessary to discuss these cases. Even if the law of Ohio is that constructive knowledge rather than actual knowledge, triggers the running of the four-year statute of limitations for fraud, the Trustee's evidence is that the Debtor's successful operation of the Ponzi scheme remained undiscovered until, at the earliest, May 3, 1989, the date the petition was filed. Furthermore, the court notes that none of the defendants, individually or collectively, filed affidavits or submitted other evidence establishing that any party (except the Debtor and, if subsequently proven, those who were in direct participation with her) had knowledge of the fraud. To the extent that various defendants, referring to affidavits and other materials submitted by the Trustee, or through requests that the court take judicial notice of the existence, but not the content, of prepetition litigation against the Debtor, argue that constructive knowledge of the fraud existed prior to May 3, 1989, the evidence supports the Trustee's position and not the defendants' position. *Street v. J.C. Bradford & Co.*, 886 F.2d at 1479–80.

Accordingly, because the Trustee filed these adversaries within three years of the petition date, the Trustee is not barred by the four-year statute of limitations. Further, because O.R.C. § 2305.09(C) only requires that the cause be brought within four years of discovery of the fraud, the Trustee is not limited in the number of years which he can reach back. Thus, the Trustee can reach back to avoid transfers to at least January 1, 1978. Further, the provisions of § 544(b) concerning knowledge of fraud do not bar the Trustee's causes of action. No evidence has been established by any defendant, individually or collectively, that any defendant had knowledge of any fraud or fraudulent scheme on the part of the Debtor. In addition, the court determines that the Trustee's causes of action are not barred by defenses such as laches, estoppel, or any other equitable doctrines. Based upon the uncontradicted evidence presented by the Trustee, the court determines that the Trustee met his burden of proving, under applicable summary judgment standards, that his causes of action should not be barred by any of these equitable doctrines. These equitable doctrines are issues upon which the defendants bear the burden of proof. *See Celotex*, 477 U.S. at 321–325, 106 S.Ct. at 2552–53; *Street v. J.C. Bradford & Co.*, 886 F.2d at 1479. No defendant has presented any evidence to contradict the Trustee's evidence, nor has any defendant provided any authority for applying any of these doctrines in these proceedings. *Street v. J.C. Bradford & Co.*, 886 F.2d at 1479 (the movant for summary judgment may establish his burden of showing "the absence of a genuine issue of material fact" by pointing out to the court that the respondent has not presented evidence to support an essential element of his or her case).

Thus, the court concludes that neither laches, estoppel, nor any other equitable doctrines bar the Trustee's causes of action in these proceedings.

6. *THE ORDINARY COURSE OF BUSINESS DEFENSE IS NOT APPLICABLE TO 547 PREFERENCE CLAIMS* [15]

The Trustee asserts that, as a matter of law, the ordinary course of business

---

15. This issue applies only to the following pending adversaries: 3–92–0093, Estes, et al.; 3–92–

defense contained in 11 U.S.C. § 547(c)(2) is not applicable to payments received from one engaged in a ponzi scheme, regardless of the good faith or knowledge of the transferee.

To come within § 547(c)(2),[16] the transfer must have been made in the ordinary course of business. Assuming an innocent investor believes he or she is dealing with a legitimate investment venture, payments may be within the ordinary course of business as to the investor. However, Section 547 additionally requires that the payments be made in the ordinary course of business of the *debtor*. *Graulty v. Brooks (In re Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.)*, 819 F.2d 214, 217 (9th Cir.1987). *See Logan v. Basic Distribution Corp. (In re Fred Hawes Organization, Inc.)*, 957 F.2d 239, 243 (6th Cir. 1992).

Ponzi schemes are not legitimate businesses which Congress intended to protect by enactment of § 547(c)(2). *Henderson v. Buchanan*, 985 F.2d 1021, 1025 (9th Cir.1993); *Graulty*, 819 F.2d at 217.

> To apply [§ 547](c)(2) to immunize these activities "would lend judicial support to 'Ponzi' schemes by rewarding early investors at the expense of later victims." These defendants received the funds from investments made on the eve of bankruptcy, by persons who recovered nothing. Equity requires that the creditors all share equally in whatever assets are available.

*Henderson v. Allred (In re Western World Funding, Inc.)*, 54 B.R. 470, 481 (Bankr. D.Nev.1985) (citations omitted); *see also Graulty*, 819 F.2d at 217. *Accord Henderson*, 985 F.2d 1021, 1025 (9th Cir.

1993); *Rafoth v. Bailey (In re Baker & Getty Fin. Services, Inc.)*, 88 B.R. 792, 799 (N.D. Ohio 1988).

Having found that the Debtor was operating a ponzi scheme, the court concludes that § 547(c)(2) is not available as a defense to any of the Trustee's actions pursuant to 11 U.S.C. § 547.

## V. DETERMINATION PURSUANT TO FED.R.BANKR.P. 7054

This court recognizes that the orders in accordance with this decision only grant the Trustee's motion for partial summary judgment on the common issues involved in the remaining pending adversary proceedings and the proofs of claims in the estate case and are not orders which terminate all of the issues involved in all the pending litigation. Nevertheless, this court determines that, as to all the common issues determined in this decision, the orders consistent with this decision are to be entered pursuant to Fed. R.Bankr.P. 7054 "upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment." Rule 54(b); *Seor, Inc. v. Textron Oil Corp. (In re Frederick Petroleum Corp.)*, 912 F.2d 850, 853–54 (6th Cir.1990).

This court does not routinely enter such determinations, nor does it do so as an accommodation to counsel. The court, however, has considered the relationship between the resolution of these common issues and all remaining issues and determines that this decision constitutes a complete determination of the common issues and a necessary step in the management of the difficult and protracted pending litigation involving complex issues, multiple parties, difficult legal ques-

---

0094, Abramowitz, et al.; 3–92–0096, Leach; 3–92–0022, Niswonger; 3–92–0098, Dan Taubman; 3–92–0070, Winfred Smith; 3–92–0050, Venema; 3–92–0100, Gunter; 3–92–0029, Leiber; 3–92–0057, Frey; 3–92–0097, Taguchi; 3–92–0065, Shane; 3–92–0092, Peterson; 3–92–0102, Holycross.

**16.** Section 547(c)(2) provides:

 (c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

 (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

 (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

 (C) made according to ordinary business terms[.]

tions, and unusual proof problems. Further, no legal issues remain. All that remains for determination is the application of the now established law of the case to the particular facts of each specific adversary or each proof of claim proceeding. Further, in the event of appellate review, an appellate court should not have to consider these issues twice, nor would the Trustee's continued litigation, whether successful or not, necessarily moot any appellate review.

This bankruptcy case was filed on May 3, 1989 as a chapter 11 case and subsequently converted to a chapter 7 case. The Trustee has been attempting to liquidate assets and litigate causes of action so that the claimants, many of whom are elderly, and, in some instances, have been deprived of all, or a substantial part, of their assets as a result of the Debtor's ponzi scheme, may begin to receive distribution from the funds collected. At the oral arguments held October 19, 1993, the Trustee, for the first time, stated that a partial distribution could occur in the near future. Central to the Trustee's efforts to accomplish the proposed partial distribution in the estate case and his continuation of the pending litigation in the remaining adversary proceedings is the finality of the court's order on these common issues. Any further delay in the finality of these orders will produce harm to the estate and its creditors, but will produce no harm to the parties adversely affected by these orders which is not intrinsic in every adverse ruling. *See generally, Local Union No. 1812 v. Bethenergy Mines, Inc.,* 992 F.2d 569, 572 (6th Cir.1993).

Accordingly, the orders consistent with this decision are entered upon express determinations pursuant to Fed.R.Bankr.P. 7054.

### VI. CONCLUSION

Based upon the foregoing, the motion for partial summary judgment filed by the Trustee is GRANTED, and the court finds the following as to all pending adversary proceedings and all proofs of claim:

1) The Debtor was engaged in a ponzi scheme from January 1, 1978 through May 3, 1989.

2) The Debtor was insolvent, continuously, from January 1, 1978 through May 3, 1989.

3) The proofs of claim are hereby separated into an "A" claim and a "B" claim. The "A" claim represents, on a cash-in/cash-out basis the difference, if any, between what an investor actually invested, lent, or gave to the Debtor, *minus* the total he or she received back at any time. The "B" portion consists of all profit, interest, return of principal, punitive damages, multiple damages, or any amount in excess of actual pecuniary loss. The "B" claims shall receive distribution only after all "A" claims have been paid in full.

4) The Trustee may avoid all transfers in excess of a defendant's original investment, referred to as "false profits," within one year of the petition pursuant to 11 U.S.C. § 548. Further, the Trustee may set aside certain fraudulent conveyances pursuant to 11 U.S.C. § 544, which incorporates applicable provisions under the Uniform Fraudulent Conveyance Act.

5) The Uniform Fraudulent Conveyance Act, not the Uniform Fraudulent Transfer Act, is applicable law. Further, the Trustee is not barred by a specific statute of limitation including the four-year statute of limitation under the Uniform Fraudulent Conveyance Act, nor by laches, estoppel, or any other equitable defenses.

6) 11 U.S.C. § 547(c)(2) is not a defense to the Trustee's preference claims under 11 U.S.C. § 547.

The Clerk is directed to file this decision in the estate case and in each of the listed adversary proceedings.