280 B.R. 103 (2002)
In re C.F. FOODS, L.P., Debtor.
Arthur Liebersohn, Trustee, Plaintiff,
v.
Campus Crusade for Christ, Inc., Defendant.
Bankruptcy No. 99-15996 KJC. Adversary No. 00-443.
United States Bankruptcy Court, E.D. Pennsylvania.
July 3, 2002.
*104 Michael H. Kaliner, Fairless Hills, PA, for debtor.
Dennis Kasper, Lewis, D'Amato, Brisbois & Bisguard, Los Angeles, CA, Marnie E. Simon, Philadelphia, PA, for defendant.
Camille Spinale, Philadelphia, PA, for plaintiff.

OPINION[1]
KEVIN J. CAREY, Bankruptcy Judge.
An involuntary chapter 7 bankruptcy petition was filed against C.F. Foods, L.P. (the "Debtor" or "CF Foods") on May 6, 1999. An order for relief was entered on July 1, 1999 and the chapter 7 trustee was appointed on July 15, 1999.
*105 On June 15, 2000, the trustee filed a complaint against Campus Crusade for Christ, Inc. ("Campus Crusade"),[2] alleging that twenty-four payments, totaling $72,200.00, that were made by the Debtor to Campus Crusade between December 1995 and January 1999 should be avoided as fraudulent transfers pursuant to Bankruptcy Code §§ 544(b) and 548 (11 U.S.C. § 544(b) and § 548) and the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa.C.S.A. § 5101 et seq ("PUFTA").[3] On August 10, 2000, Campus Crusade filed an answer to the complaint. A trial was held on April 26, 2001 and, thereafter, the parties filed post-trial memoranda of law. Upon further order of this court, the parties also filed Proposed Findings of Fact and Conclusions of Law.
The trustee argues that the payments made by the Debtor to Campus Crusade were made with the actual intent to hinder, delay and defraud creditors because, as admitted by the Debtor's general partner, David P. Burry, virtually all of the Debtor's business operations were nothing more than a Ponzi scheme.[4] Therefore, the trustee argues that the transfers are avoidable under § 5104(a)(1) of PUFTA and § 548(a)(1)(A) of the Bankruptcy Code, due to the Debtor's actual intent to defraud creditors. In the alternative, the trustee also argues that the transfers are avoidable under theories of constructive fraud, as set forth in § 5104(a)(2) of PUFTA and § 548(a)(1)(B) of the Bankruptcy Code, because (i) Campus Crusade did not give the Debtor reasonably equivalent value in return for the transfers; and (ii) the Debtor was engaged in a business for which the remaining assets of the Debtor were unreasonably small in relation to the business or the Debtor intended to incur debts beyond the Debtor's ability to pay as they became due. Campus Crusade did not present any evidence at trial, but argues that the trustee's evidence was not sufficient to prove either (i) actual intent to *106 defraud creditors, by failing to establish the existence of any of the "badges of fraud" as set forth in § 5104(b), or (ii) constructive intent to defraud creditors by failing to analyze adequately the partners' nonpartnership assets in determining whether the Debtor was insolvent.
For the reasons set forth below, the relief requested by the trustee will be granted.

FACTS[5]
On January 1, 1994, David Burry formed a limited partnership in Chadds Ford, Pennsylvania known as "C.F. Foods, L.P." CF Foods was created for the stated purpose of engaging in the purchase, sale and distribution of wholesale candies from large candy manufacturers and wholesale distributors to local purchasers, such as supermarkets, candy stores, and other retailers.
Burry was a general partner who managed and operated CF Foods. Edward Stillman was an alleged limited partner and investor in CF Foods. Burry solicited investors in CF Foods by promising them that his expertise in the wholesale candy distribution business resulted in high profits for CF Foods and, as a result, CF Foods could provide returns of 18-30% to investors. The returns paid to CF Foods' early investors were paid for with the proceeds derived from investments made by later investors. Over time, the seemingly impressive returns paid by CF Foods to its investors gained the attention of the friends and family of both Burry and Edward Stillman, and interest in investing in the enterprise grew. Burry eventually attracted over $25 million in investments in CF Foods.
Burry represented to investors, his business partner, financial institutions, and his accountant that he was very successful at purchasing very large quantities of candy from wholesalers and manufacturers at "close-out" prices and then re-selling these large quantities in the marketplace for a significant mark-up. CF Foods purportedly conducted two types of sales transactions. The portion of the business dubbed by Burry as "Sales One" was completely fictitious and fraudulent in nature. Burry was solely responsible for managing Sales One and no one at CF Foods other than Burry had any personal involvement in this aspect of the business. Sales One ostensibly involved the purchase of large quantities of "close out products" and subsequent re-sale to customers through direct shipment orders. In reality, no such transactions ever occurred.
The other portion of the business, known as "Sales Two," was the "legitimate" aspect of CF Foods with real employees, real inventory, and real sales deliveries. In 1998, Sales Two reflected actual sales totaling less than $5 million, out of total reported sales of more than $140 million. The exact amount of "Sales Two" transactions is difficult to pinpoint because Burry included some fraudulent "Sales One" transactions in those reported as "Sales Two" transactions and CF Foods' internal accounting records are otherwise unreliable, given Burry's widespread forgeries and falsification of records.
Using the invoices, shipping documents, and related business records acquired from the small amount of real candy business conducted by CF Foods, Burry systematically created phony "business records" by "whiting out" old information, *107 typing in new information, and then photocopying the forged record so that it would be indistinguishable from a copy of an authentic business record reflecting a real transaction. Burry then logged hundreds of fictitious transactions into the computerized general ledger system for CF Foods, which generated impressive  but false  balance sheets, income statements, and accounts receivable listings, among others.
Burry took these financial statements to a certified public accountant, who then prepared a review of the financial information provided to him by Burry. The accountant was never asked by Burry to conduct an audit of CF Foods, and the reports he prepared were merely summaries of the false financial information provided by Burry.
As a result of the false information provided by Burry to his accountant, the following total sales figures were reported to investors and financial institutions:

 Year Sales Reported
 1994 $ 8,699,152
 1995 $ 19,026,265
 1996 $ 40,590,990
 1997 $ 83,985,013
 1998 $142,990,010
 Total $295,291,430

By David Burry's own admission, approximately 97% of these sales never actually occurred.
Beginning in January 1999, in an effort to meet the increasing financial strains imposed on CF Foods as a result of demands for repayment of capital by investors in CF Foods, Burry engaged in a massive check kiting scheme, involving hundreds of checks totaling more than $70 million that were written on 20 different bank accounts controlled by Burry at First Union National Bank, PNC Bank, Commerce Bank, Fleet Bank and Bank of America. Burry's check kiting activities eventually resulted in total losses of approximately $2.5 million to three of the financial institutions.
Between April 7 and 9, 1999, PNC Bank notified CF Foods that its operating account was overdrawn by approximately $1 million. As a result of the overdraft problems, on Saturday, April 10, 1999, Burry admitted to Edward Stillman that the "Sales One" portion of the CF Foods operation had been a "sham" and that no such sales ever occurred. Burry told Stillman that he had cut and pasted receipts to deceive other individuals and banks, and stated that he went to work early in the morning and stayed late into the night putting together fake business records. Burry also admitted to Stillman that he had intercepted audit confirmation requests sent out by CF Foods' auditors by contacting various businesses and telling them that the confirmation requests had been sent out by mistake and should be returned to Burry, who then falsely confirmed the receivables balances.
Burry also made similar admissions to other persons. On April 10, 1999, Burry told Paul Weis, who had worked as the controller for CF Foods, that "Sales One was nothing more than a Ponzi scheme" and that "I got good with white out and doctoring bank and other records." On April 10, 1999, Burry told his brother-in-law that he had been living a "lie" for a long time and had "embezzled" money from CF Foods, family members, friends, banks, church members and others. On April 20, 1999, Burry also gave a full confession admitting his responsibility for the entire CF Foods Ponzi scheme in a meeting with the U.S. Attorney's Office and the FBI.
During the period of the December 28, 1995 through January 19, 1999, CF Foods *108 made the following payments to Campus Crusade (the "Transfers"):

 -----------------------------------
 Date Amount
 -----------------------------------
 12/28/95 $ 1,000.00
 -----------------------------------
 4/2/96 $ 500.00
 -----------------------------------
 7/24/96 $ 500.00
 -----------------------------------
 9/11/96 $ 500.00
 -----------------------------------
 10/7/96 $ 1,000.00
 -----------------------------------
 12/4/96 $ 1,700.00
 -----------------------------------
 2/12/97 $ 1,500.00
 -----------------------------------
 3/17/97 $ 1,500.00
 -----------------------------------
 4/28/97 $ 1,500.00
 -----------------------------------
 4/28/97 $ 500.00
 -----------------------------------
 7/14/97 $ 1,500.00
 -----------------------------------
 7/14/97 $ 500.00
 -----------------------------------
 10/3/97 $ 2,000.00
 -----------------------------------
 10/8/97 $ 18,000.00
 -----------------------------------
 1/20/98 $ 500.00
 -----------------------------------
 1/20/98 $ 1,500.00
 -----------------------------------
 4/13/98 $ 500.00
 -----------------------------------
 4/13/98 $ 1,500.00
 -----------------------------------
 4/27/98 $ 1,500.00
 -----------------------------------
 7/20/98 $ 3,500.00
 -----------------------------------
 7/21/98 $ 10,000.00
 -----------------------------------
 8/12/98 $ 12,000.00
 -----------------------------------
 10/19/98 $ 4,500.00
 -----------------------------------
 1/19/99 $ 4,500.00
 -----------------------------------
 Total $ 72,200.00
 -----------------------------------

In response to the trustee's Request for Admissions, Campus Crusade admitted that it received the foregoing payments and that each payment constituted "..a transfer of property of the Debtor, to or for the benefit of [Campus Crusade]."[6] In response to the trustee's interrogatories, Campus Crusade stated that it ". . . does not believe that the donations(s) [i.e., the Transfers] resulted from the delivery of goods, services or loans of money or other reasonably equivalent value delivered by the Defendant to the Debtor."[7]
At trial, the trustee also presented testimony of his certified public accountant, Daniel J. Coffey, who testified about his review and analysis of the exhibits introduced at trial, the Debtor's books and records, other documents regarding the Debtor's finances obtained from third party sources, such as banks or pension plans, and information from Burry's criminal trial.[8] Based upon his review and analysis, the accountant offered expert opinions (i) regarding the insolvency of the Debtor, which included a review of Burry's finances,[9] (ii) that, at the time the Debtor was making transfers to Campus Crusade, the Debtor was engaged in a business with an unreasonably small amount of capital,[10] and (iii) that the Debtor intended to incur debt beyond its ability to pay such debt as it matured.[11]

DISCUSSION
A. The Transfers to Campus Crusade were made by the Debtor with actual intent to hinder, delay or defraud creditors and are avoidable under both § 5104(a)(1) of PUFTA and § 548(a)(1)(A) of the Bankruptcy Code.
The trustee argues that the Transfers were made by the Debtor with an actual intent to hinder, delay or defraud its creditors and, therefore, are avoidable under both § 5104(a)(1) of PUFTA and § 548(a)(1)(A) of the Bankruptcy Code.[12] *109 Campus Crusade argues that the trustee did not present sufficient evidence to establish the existence of any of the factors set forth in § 5104(b), often referred to as the "badges of fraud." The plain language of § 5104(b) clearly provides that other factors, beyond those listed, can be considered in determining whether a transfer was made with actual intent to defraud.[13] Therefore, even in the absence of any of the enumerated badges, a court can find actual fraud.
The parties do not dispute that the trustee, as plaintiff, has the burden of proving the Debtor's actual intent to defraud creditors.[14] Burry, the Debtor's *110 general partner, admitted that the vast majority of the Debtor's operations were nothing more than a Ponzi scheme. (Exhibit T-1).[15] Numerous courts have decided that a debtor's actual intent to hinder, delay or defraud creditors may be inferred from the Debtor's active participation in a Ponzi scheme. Cohen, 199 B.R. at 717; Jobin v. Ripley (In re M & L Business Machine Co., Inc.), 198 B.R. 800, 806-07 (D.Colo.1996); Merrill v. Abbott (In re Independent Clearing House Co.), 77 B.R. 843, 860-61 (D.Utah 1987); Floyd v. Dunson (In re Ramirez Rodriguez), 209 B.R. 424, 433 (Bankr.S.D.Tex.1997); Emerson v. Maples (In re Mark Benskin & Co.), 161 B.R. 644, 649 (Bankr.W.D.Tenn.1993); Taubman, 160 B.R. at 983.[16] As explained by the court in Independent Clearing House,
One can infer an intent to defraud future undertakers [investors] from the mere fact that a debtor was running a Ponzi scheme. Indeed, no other reasonable inference is possible. A Ponzi scheme cannot work forever. The investor pool is a limited resource and will eventually run dry. The perpetrator must know that the scheme will eventually collapse as a result of the inability to attract new investors. The perpetrator nevertheless makes payments to present investors, which, by definition, are meant to attract new investors. He must know all along, from the very nature of his activities, that investors at the end of the line will lose their money. Knowledge to a substantial certainty constitutes intent in the eyes of the law, cf. Restatement (Second) of Torts § 8A (1963 & 1964), and a debtor's knowledge that future investors will not be paid is sufficient to establish his actual intent to defraud them. Cf. Coleman Am. Moving Servs., Inc. v. First Nat'l Bank & Trust Co. (In re American Properties, Inc.), 14 B.R. 637, 643 (Bankr.D.Kan.1981)(intentionally carrying out a transaction with full knowledge that its effect will be detrimental to *111 creditors is sufficient for actual intent to hinder, delay or defraud within the meaning of § 548(a)(1)).
Independent Clearing House, 77 B.R. at 860. Further, a guilty plea or criminal conviction of the perpetrator of the Ponzi scheme provides evidence of actual fraudulent intent. Ramirez Rodriguez, 209 B.R. at 433; Benskin & Co., 161 B.R. at 649.
The Transfers at issue were charitable contributions.[17] Although Campus Crusade was not an investor in the Ponzi scheme, neither § 5104(a)(1) nor § 548(a)(1)(A) requires that the transfers be made to defraud the transferee, but only that they are made with actual intent to hinder, delay or defraud any creditor of the debtor (12 Pa.C.S.A. § 5104(a)(1)) or any entity to which the debtor was or became indebted (11 U.S.C. § 548(a)(1)(A)). See In re Blatstein, 192 F.3d 88, 97-98 (3d Cir.1999). Cf. Independent Clearing House, 77 B.R. at 860 ("To be fraudulent under section 548(a)(1) a transfer need not be made with the intent to hinder, delay or defraud the transferee. The trustee need only show that the transfers were made with the intent to hinder, delay or defraud `any entity to which the debtor was or became [indebted], on or after the date that such transfer occurred.' 11 U.S.C. § 548(a)(1) (emphasis added).")
It is also reasonable, and, in this case, appropriate, to infer that, except for transfers to a person who took in good faith and for a reasonably equivalent value, as described in § 5108(a) of PUFTA or in § 548(c) of the Bankruptcy Code, all other transfers made by the debtor during an on-going Ponzi scheme are part of the overall fraud. The "good faith" exceptions found in § 5108(a) of PUFTA and § 548(c) of the Bankruptcy Code are not applicable to the Transfers at issue here, because, in its answer to the trustee's interrogatories, Campus Crusade admitted that the Transfers were not in return for "the delivery of goods, services or loans of money or other reasonably equivalent value delivered by [Campus Crusade] to the Debtor."[18] In perpetrating the Ponzi scheme, Burry had to know that the monies from investors would eventually run out and that the payments to charities would contribute to the eventual collapse of the stratagem. Knowledge that future investors will not be paid is sufficient to establish actual intent to defraud them. Independent Clearing House, 77 B.R. at 860.[19]
The trustee's expert also opined that the Debtor's payments of $1.7 million to charities during the four years prior to the bankruptcy filing, including the transfers to Campus Crusade, were made as part of the fraudulent scheme to impress investors that the Debtor was a profitable and charitable enterprise.[20] Based upon all of the facts and circumstances, this inference can be drawn even absent an expert's conclusion about this part of the scheme.
Based upon the foregoing, I conclude that the Transfers to Campus Crusade *112 were made by the Debtor with actual intent to defraud creditors.
Pursuant to 12 Pa.C.S.A. § 5109, the cause of action with respect to a fraudulent transfer under § 5104(a)(1) must be brought "within four years after the transfer was made . . . or, if later, within one year after the transfer . . . was or could reasonably have been discovered by the claimant." 12 Pa.C.S.A. § 5109(1). Bankruptcy Code § 108(a) extends the applicable nonbankruptcy law period for commencing an action to the later of (i) the end of such period; or (ii) two years after the order for relief.[21] The order for relief in this case was entered on July 1, 1999 and the trustee commenced this adversary proceeding on June 15, 2000, which is within the two-year extension of PUFTA § 5109(1), effected by Bankruptcy Code § 108(a). Because each of the Transfers to Campus Crusade described in the trustee's complaint were made within four years of the order for relief, all of the Transfers are avoidable pursuant to 11 U.S.C. § 544(b) and 12 Pa.C.S.A. §§ 5104(a)(1), 5107(a), and 5109 (as extended by 11 U.S.C. § 108(a)). Additionally, the Transfers made within one year before the date of the filing of the Debtor's petition are also avoidable pursuant to 11 U.S.C. § 548(a)(1)(A).
B. The Transfers to Campus Crusade were made by the Debtor without receiving reasonably equivalent value in exchange for the transfers and the Debtor (i) was engaged in a business for which the remaining assets of the debtor were unreasonably small in relation to its business; and (ii) intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.
The trustee also argues that the Transfers to Campus Crusade are avoidable under the constructive fraud theories set forth in § 5104(a)(2) of PUFTA and § 548(a)(1)(B) of the Bankruptcy Code.[22] To weigh adequately the parties' arguments *113 concerning § 5104(a)(2) of PUFTA, I must first decide their respective burdens of proof.[23] In so doing, I have considered and compared the rule followed in interpreting the constructive fraud provisions of the now-repealed UFCA, the legislative history of PUFTA, as well as the intervening enactment of Bankruptcy Code § 548.
When considering cases under the UFCA, both state and federal courts held that the burden of proof "shifts" in matters alleging constructive fraud, so that after the creditor challenging the transfer shows that the grantor was in debt at the time of the conveyance, "the burden shifts to the grantees to establish by clear and convincing evidence, either that the grantor was then solvent and not rendered insolvent by the conveyance, or that he received fair consideration for the conveyance." Elliott v. Kiesewetter, 98 F.3d 47 (3d Cir.1996) citing Coscia v. Hendrie, 427 Pa.Super. 585, 629 A.2d 1024, 1026 (1993).
In 1993, Pennsylvania enacted PUFTA to replace the UFCA.[24] PUFTA itself is silent on the issue of burdens of proof for constructive fraud and there is no decisional law in this Circuit or in Pennsylvania resolving the question authoritatively.[25] However, the legislative history, particularly the Committee Comments to the statute, is helpful.[26] Comment (6) to § 5102 of *114 PUFTA provides guidance regarding the burdens of proof under PUFTA, specifically with respect to constructive fraud matters, as follows:
Neither this chapter nor these comments comprehensively address such evidentiary and procedural matters as the standard of proof required to establish particular facts, allocation of the burden of proof and burden of persuasion, and the circumstances in which such burdens may shift. Certain specific points are addressed. See, e.g., subsection (b), Comment (5) to 12 Pa.C.S. § 5104 infra, and Comments (1) and (6) to 12 Pa.C.S. § 5108 infra. Except for points specifically addressed, these matters are left to the courts to determine, giving appropriate consideration to, among other things, the policy of construing uniform laws to make uniform the laws of those states that have enacted similar uniform laws (as set forth in 1 Pa.C.S. § 1927 and in the transitional provisions of the act enacting this chapter), the possible desirability of conformity with similar provisions of the Bankruptcy Code and, to the extent not inconsistent with this chapter, prior Pennsylvania case law. However, certain cases applying prior Pennsylvania law have stated in effect (if rephrased in the terms used in this chapter) that if a creditor establishes that the transferor was in debt at the time of a transfer, the burden shifts to the parties seeking to uphold the transfer to establish that the transferor received reasonably equivalent value or met the financial conditions required by 12 Pa.C.S. §§ 5104(a)(2) and 5105. Stinner v. Stinner, 300 Pa.Super. 351, 446 A.2d 651 (1982); In re Glenn, 108 B.R. 70 (Bankr.W.D.Pa.1989). That principle is an archaism and has not been consistently followed (compare, e.g., In re Joshua Slocum, Ltd., 103 B.R. 610 (Bankr.E.D.Pa.1989), aff'd. mem., 121 B.R. 442 (E.D.Pa.1989)), and in any event should not be followed in applying this chapter.
12 Pa.C.S.A. § 5102, Committee Comment  1993, No. 6 (1999)(emphasis added). Comment (8) to § 5102 of PUFTA notes the Comment (6) is a nonuniform addition.
The foregoing comments clearly reflect that the drafters of PUFTA considered the parties' burdens of proof and chose not to adopt the prior Pennsylvania law regarding burden shifting for cases alleging constructive fraud. When the drafters wanted to create specific presumptions or defenses that would shift the burden of proof from the creditor challenging the transfer, those presumptions and defenses were clearly and specifically defined. See, e.g., 12 Pa.C.S.A. § 5102(b)(Presumption of insolvency); 12 Pa.C.S.A. § 5102, Committee Comment  1993, No. 2 (1999)("The presumption [of insolvency] is established in recognition of the difficulties typically imposed on a creditor in proving insolvency in the bankruptcy sense . . ."); 12 Pa.C.S.A. § 5104, Committee Comment  1993, No. 5 (1999)("Proof of the existence of any one or more of the factors enumerated in subsection (b) [of § 5104] may be relevant evidence as to the debtor's actual intent but does not create a presumption that the debtor has made a fraudulent transfer."); 12 Pa.C.S.A. § 5108, Committee Comment  1993, No. 1 (1999)("The person who invokes [the good faith defense to a case alleging actual intent to defraud creditors] . . . carries the burden of establishing good faith and the reasonable *115 equivalence of the consideration exchanged.").
Furthermore, the drafters of the Uniform Fraudulent Transfer Act looked to the federal Bankruptcy Code for guidance. See Michael L. Cook and Richard E. Mendales, The Uniform Fraudulent Transfer Act: An Introductory Critique, 62 Am.Bankr.L.J. 87, 87 (1988). Logically, it follows that the drafters of PUFTA expected § 5104(a)(2) of PUFTA and § 548(a)(1)(B) of the Bankruptcy Code to be construed and interpreted in a uniform manner.[27] The Third Circuit Court of Appeals has held consistently that the plaintiff must prove each of the elements of a constructive fraud claim brought under Bankruptcy Code § 548. Mellon Bank, N.A. v. The Official Comm. of Unsecured Creditors of R.M.L., Inc. (In re R.M.L., Inc.), 92 F.3d 139, 144 (3d Cir.1996)(citing BFP v. Resolution Trust Corp., 511 U.S. 531, 114 S.Ct. 1757, 1760, 128 L.Ed.2d 556 (1994)); Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 648 (3d Cir.1991) cert. denied 503 U.S. 937, 112 S.Ct. 1476, 117 L.Ed.2d 620 (1992). Bankruptcy courts in other jurisdictions have held likewise. Cuthill v. Greenmark, LLC (In re World Vision Entertainment, Inc.), 275 B.R. 641, 655-57 (Bankr.M.D.Fla.2002); Baumgart v. Bedlyn, Inc. (In re Empire Interiors, Inc.), 248 B.R. 305, 307 (Bankr.N.D.Ohio 2000); Breeden v. L.I.Bridge Fund, LLC (In re Bennett Funding Group, Inc.), 232 B.R. 565, 570 (Bankr.N.D.N.Y.1999). These bankruptcy courts also specify that the appropriate standard of proof in constructive fraud cases is the preponderance of the evidence standard. World Vision, 275 B.R. at 655; Empire Interiors, 248 B.R. at 307; Bennett Funding Group, 232 B.R. at 570.
For all of the foregoing reasons, I conclude that, except when the statute expressly provides otherwise, there is no shifting burden of proof in a constructive fraud proceeding brought under § 5104(a)(2) or § 5105[28] of PUFTA and, therefore, the plaintiff carries the burden of proof on all elements by a preponderance of the evidence standard.
Campus Crusade admitted that it did not provide the Debtor with "reasonably equivalent value" in exchange for the Transfers.[29] Therefore, the trustee is left with the burden of proving that, at the time the Transfers were made, the Debtor either (i) was engaged in a business for which its remaining assets were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due. 12 Pa.C.S.A. § 5104(a)(2)(i) and (ii).[30] (See *116 also 11 U.S.C. § 548(a)(1)(B)(ii)(II) and (III)). The Committee Comments to PUFTA § 5104 state:
In general, the tests of paragraphs (a)(2)(i) and (a)(2)(ii) should be viewed as addressing slightly different aspects of the same fundamental inquiry: whether the debtor is and, on a continuing basis will be able to pay its debts as they become due. By definition, a debtor which reasonably should be able to pay its debts as they become due on a continuing basis should be deemed to have adequate assets in relation to its business or transaction, sufficient to satisfy the test of paragraph (a)(2)(i), and such debtor also should be deemed to satisfy the "reasonably should have believed" test of paragraph (a)(2)(ii).
12 Pa.C.S.A. § 5104, Committee Comment  1993, No. 4 (1999). Although there are not many cases interpreting the phrase "unreasonably small assets," other courts have turned to cases which review the similar Bankruptcy Code provision § 548(a)(2)(B)(ii) for guidance on this issue. Salisbury v. Texas Commerce Bank-Houston, N.A. (In re WCC Holding Corp.), 171 B.R. 972, 985 (Bankr.N.D.Tex.1994); Taubman, 160 B.R. at 988. Both the WCC and Taubman courts determined that the "unreasonably small assets" (or the "unreasonably small capital") test requires an analysis of the debtor's ability to generate sufficient cash flow from operations and the sale of assets to pay its debts and remain financially stable. Id.
Burry has admitted that virtually all of the Debtor's business was a Ponzi scheme. As such, the Debtor's ability to generate cash flow to pay its "debts" came only from the continuation of the fraudulent scheme  and the operation could never be "financially stable," since its collapse was inevitable.
The test described in both PUFTA § 5104(a)(2)(ii) and Bankruptcy Code § 548(a)(1)(B)(ii)(III) is more easily met. Burry's operation of the Debtor's Ponzi scheme shows his subjective intent to incur debts beyond the Debtor's ability to pay as they became due. See Taubman, 160 B.R. *117 at 987 (requiring a determination of the debtor's subjective intent under a § 548(a)(1)(B)(ii)(III) analysis). As discussed in the preceding section about "actual intent," as Burry doled out charitable contributions or took in new investors, he must have realized that the Ponzi scheme would eventually fail, so that, ultimately, many debts could not and would not be paid.
Accordingly, I conclude that the Transfers are avoidable under the trustee's constructive fraud theories, pursuant to 11 U.S.C. § 544(b) and 12 Pa.C.S.A. § 5104(a)(2), § 5107(a) and § 5109 (as extended by 11 U.S.C. § 108(a)). Furthermore, the Transfers made within one year before the date of the filing of the Debtor's petition also are avoidable pursuant to 11 U.S.C. § 548(a)(1)(B). An appropriate order will be entered.

ORDER
AND NOW, this 3rd day of July, 2002, for the reasons set forth in the accompanying Opinion, it is hereby ORDERED, ADJUDGED AND DECREED that:
1. The Transfers in the total amount of $72,200.00 from the Debtor to defendant Campus Crusade for Christ, Inc. are avoidable fraudulent transfers under 11 U.S.C. § 544(b) and 12 Pa.C.S.A. § 5104(a)(1) and (2), § 5107(a) and § 5109 and are recoverable by the trustee pursuant to 11 U.S.C. § 550;[1] and
2. Judgment is entered in favor of the trustee and against Campus Crusade for Christ, Inc. in the amount of $72,200.00;
3. Campus Crusade for Christ, Inc. shall remit to the trustee the sum of $72,200.00 pursuant to 11 U.S.C. § 550(a) within ten (10) days of the date of this order;
4. Any claims which Campus Crusade for Christ, Inc. may hold against the Debtor shall be disallowed until such sum of $72,200.00 is paid in accordance with 11 U.S.C. § 502(d);
5. The failure by Campus Crusade for Christ, Inc. to comply with the terms of this order will result in the imposition of statutory rate of interest as set forth in 28 U.S.C. § 1961. Computation of such interest shall commence as of the date of this Order.
NOTES
[1] This Opinion constitutes the findings of fact and conclusions of law required by Fed. R. Bankr.P. 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334, § 157(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(1) and (b)(2)(H) and (O).
[2] The original complaint also listed Paul Jany as a defendant, but by order dated April 2, 2001, Paul Jany was removed as a defendant from this adversary proceeding.
[3] The trustee's complaint refers specifically to Bankruptcy Code § 548 only in the paragraph alleging proper jurisdiction, but also avers that the "transfers are voidable pursuant to the Uniform Fraudulent Conveyance Act of Pennsylvania [now repealed] as incorporated pursuant to11 U.S.C. § 544(b) of the United States Bankruptcy Code." Complaint, ¶ 16. However, the evidence offered by the trustee at trial (as well as his arguments in the post-trial memorandum of law and Proposed Findings of Fact and Conclusions of Law), indicate that the trustee asserts that the transfers complained of are avoidable under both Bankruptcy Code § 548 and PUFTA, which is applicable to this proceeding pursuant to Bankruptcy Code § 544(b). Campus Crusades' argument at trial (as well as in its post-trial memorandum of law and Proposed Findings of Fact and Conclusions of Law), likewise indicates that Campus Crusade consented to trial of these issues under Bankruptcy Code § 548 and PUFTA. See Fed.R.Bankr.P. 7015(b), making applicable Fed.R.Civ.P. 15(b). ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.")
[4] Exhibit T-1, introduced into evidence without objection at the April 26, 2001 trial, is a certified copy of the "Government's Guilty Plea Memorandum," filed in the criminal case before the District Court for the Eastern District of Pennsylvania captioned "United States of America v. David P. Burry, Criminal No. 99-956" (the "Guilty Plea Memorandum"). The Guilty Plea Memorandum details the fraudulent activities of the Debtor's general partner, David P. Burry ("Burry"), including the fact that "[t]he returns paid to CF Foods' early investors were paid for with the proceeds derived from investments made by later investors" (p. 7) and Burry's admission that he was operating a Ponzi scheme (p. 17). See n. 15, infra, for a description of a "Ponzi scheme."
[5] The facts set forth herein are undisputed and taken largely from the Guilty Plea Memorandum. See n. 4, supra.
[6] Exhibit T-14, ¶ 2(a)-(w). Although ¶ 2 of T-14 does not include any reference to the payment made on September 11, 1996, at trial, Campus Crusade stipulated that it had received all of the checks attached to the complaint, including check no. 8936 dated September 11, 1996 in the amount of $500.00.
[7] Exhibit T-15, ¶ 2(d).
[8] See Tr. at p. 7-12.
[9] See Tr. at p. 12-17.
[10] See Tr. at p. 20-21.
[11] See Tr. at p. 21.
[12] See n. 3, infra. Section 5104(a)(1) of PUFTA and § 548(a)(1)(A) of the Bankruptcy Code contain nearly identical language, but one important distinction is that § 548(a)(1) limits the trustee's reach to transfers made within one year prior to the bankruptcy filing. PUFTA has a four-year "reach-back" period. 12 Pa.C.S.A. § 5109(1).
[13] Section 5104 of PUFTA, 12 Pa.C.S.A. § 5104(a)(1) and (b), provide:

§ 5104. Transfers fraudulent as to present and future creditors.
(a) General rule.  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
(1) with actual intent to hinder, delay or defraud any creditor of the debtor;
. . . .
(b) Certain factors.  In determining actual intent under subsection (a)(1), consideration may be given, among other factors, to whether:
(2) the transfer or the obligation was to an insider;
(3) the debtor retained possession or control of the property transferred after the transfer;
(4) the transfer or obligation was disclosed or concealed;
(5) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(6) the transfer was of substantially all the debtor's assets;
(7) the debtor absconded;
(8) the debtor removed or concealed assets;
(9) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(10) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(11) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(12) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.
[14] Earlier cases have held that the trustee must prove actual intent to defraud creditors by clear and convincing evidence. Matter of Foxcroft Square Co., 184 B.R. 671, 674 (E.D.Pa.1995); In re Taubman, 160 B.R. 964, 984 (Bankr.S.D.Ohio 1993). The foregoing cases, however, analyze the burden of proof standard under each state's enacted version of the Uniform Fraudulent Conveyance Act. Pennsylvania repealed the Pennsylvania Uniform Fraudulent Conveyance Act (the "UFCA") by P.L. 479, No. 70, § 1 (Dec. 3, 1993), and replaced it with PUFTA. In Plotkin v. Pomona Valley Imports, Inc. (In re Cohen), 199 B.R. 709 (9th Cir. BAP 1996), the Bankruptcy Appellate Panel of the Ninth Circuit Court of Appeals decided that determining whether transfers were made with actual intent to hinder, delay or defraud creditors utilized the same inquiry under either 11 U.S.C. § 548(a)(1) or the Uniform Fraudulent Transfer Act, but did not specify which standard applied. Cohen, 199 B.R. at 716. Generally, courts do not agree which standard applies to "actual intent" actions under § 548(a)(1)(A). Compare Provident Life and Accident Ins. Co. v. General Syndicators of America (In re Laramie Assoc., Ltd), 1997 WL 587288, at *6 (E.D.Pa.1997)(clear and convincing evidence standard) with Thompson v. Jonovich (In re Food & Fibre Protection, Ltd.), 168 B.R. 408, 418 (Bankr.D.Ariz.1994)(preponderance of the evidence standard). See also Development Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.), 250 B.R. 776, 790-91 (Bankr.S.D.Fla.2000) (noting disagreement regarding which standard applies in Florida courts, but deciding that, under the Supreme Court's decision in Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), a preponderance of the evidence standard applies to fraudulent conveyance actions). Because the trustee has met the more strict "clear and convincing evidence" standard in the matter now before me, I need not, and therefore do not, decide whether the standard for proving actual fraud under either PUFTA or Bankruptcy Code § 548(a)(1)(A) is the "clear and convincing test" or the "preponderance of the evidence" test.
[15] A "Ponzi scheme" has been described as follows:

In general, a ponzi scheme is a fraudulent investment arrangement in which returns to investors are not obtained from any underlying business venture but are taken from monies received from new investors. Typically, investors are promised high rates of return and initial investors obtain a greater amount of money from the ponzi scheme than those who join the ponzi scheme later. As a result of the absence of sufficient, or any, assets able to generate funds necessary to pay the promised returns, the success of such a scheme guarantees its demise because the operator must attract more and more funds, which thereby creates a greater need for funds to pay previous investors, all of which ultimately causes the scheme to collapse.
Taubman, 160 B.R. at 978 (citations omitted).
[16] Although most of these cases conclude that participation in a Ponzi scheme provides proof of a debtor's actual intent to defraud creditors under 11 U.S.C. § 548(a)(1)(A), a number of courts have also held that this analysis was equally applicable to proving actual fraudulent intent under the corresponding state fraudulent transfer act (Cohen, 199 B.R. at 716-17) or state fraudulent conveyance act, notwithstanding a higher burden of proof (i.e., the clear and convincing evidence standard). Independent Clearing House, 77 B.R. at 866; Taubman, 160 B.R. at 984.
[17] However, the Transfers do not qualify for the charitable contribution exception of 11 U.S.C. § 548(a)(2) because the Debtor is not a "natural person" and, therefore, the Transfers do not fit the definition of "charitable contribution" set forth in § 548(d)(3).
[18] Exhibit T-15, ¶ 2(d).
[19] Campus Crusade also argues that each transfer must be reviewed individually to determine whether the debtor actually intended to defraud creditors at the time it made the particular transfer. Because Burry admitted that 97% of the sales reported for years 1994 to 1998 never actually took place, the Ponzi scheme was ongoing through-out the period in which the Transfers were made, thereby providing evidence of the debtor's ongoing intent to defraud creditors.
[20] Tr. at p. 18-19.
[21] This section corresponds with Bankruptcy Code § 546(a), which requires an action under § 544 or § 548 to be brought within the earlier of (a) the time the case is closed or dismissed; or (b) the later of (i) two years after the order for relief; or (ii) one year after the appointment of the first trustee.
[22] Bankruptcy Code § 548(a)(1)(B) and PUFTA § 5104(a)(2) contain similar language for avoiding transfers under a constructive intent theory. However, as stated in n. 12, infra, PUFTA has a longer "reach-back" period than Bankruptcy Code § 548. Section 5104(a)(2) of PUFTA states as follows:

§ 5104. Transfers fraudulent as to present and future creditors.
(a) General rule.  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
. . . .
(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.
Bankruptcy Code § 548(a)(1)(B) provides:
11 U.S.C. § 548. Fraudulent transfers and obligations.
(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily 
. . .
(B)(i) received less than reasonably equivalent value in exchange for such transfer or obligation; and
(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.
[23] In his memorandum of law, the trustee admits that he carries the burden of proof, by a preponderance of the evidence standard, regarding his claim to avoid the Transfers under Bankruptcy Code § 548(a)(1)(B), but he does not discuss his burden of proof under § 5104(a)(2) of PUFTA. Generally, courts addressing burdens of proof under PUFTA's constructive fraud provisions have assumed that the UFCA's shifting burden formulations should be employed in PUFTA. I have been unable to locate, however, any decision applying PUFTA which examines this issue in-depth.
[24] P.L. 479, No. 70, § 1 (Dec. 3, 1993)(effective February 1, 1994).
[25] The Third Circuit Court of Appeals discussed briefly shifting burdens of proof in 718 Arch St. Assoc., Ltd. v. Blatstein (In re Blatstein; In re Main, Inc.), 192 F.3d 88 (3d Cir.1999), indicating that the shifting burden of proof standard, described in the Elliott case, would continue to apply in cases under PUFTA. Blatstein, 192 F.3d at 98. But the Court of Appeals' decision in Blatstein turned on the issue of actual fraud; the Court did not rule on the district court's disposition of the trustee's constructive fraud claims. The Blatstein panel expressly recognized this and itself noted that its discussion of constructive fraud was "not necessary for our result." Id. See also 718 Arch St. Assoc., Ltd. v. Blatstein (In re Blatstein), 260 B.R. 698, 715-16 (E.D.Pa.2001)(Yohn, J.)(deciding that the portion of the Blatstein decision discussed above is dicta). Relying upon this language in Blatstein, some bankruptcy courts have continued to apply the shifting burden of proof standard in cases involving a constructive fraud theory under § 5104(a)(2) or § 5105 of PUFTA. See Walsh v. Gutshall (In re Walter), 261 B.R. 139, 143 (Bankr.W.D.Pa.2001); Krasny v. Nam (In re Nam), 257 B.R. 749, 767 (Bankr.E.D.Pa.2000).
[26] Committee Comment  1993, No. 1 to 12 Pa.C.S.A. § 5101 provides that "This chapter [PUFTA], and the comments to this chapter, were drafted by a committee (the `Committee') of the Section on Corporation, Banking and Business Law of Pennsylvania Bar Association, with the assistance of the Joint State Government Commission. The comments are part of the legislative history of this chapter under 1 Pa.C.S. § 1939 (relating to use of comments and reports)."
[27] "The fraudulent conveyance provisions of the Bankruptcy Code are modeled on the UFCA and uniform interpretation of the two statutes is essential to promote commerce nationally." Moody v. Security Pacific Business Credit, Inc., 971 F.2d 1056, 1067-68 (3d Cir.1992) quoting United States v. Tabor Court Realty Corp., 803 F.2d 1288, 1298-99 (3d Cir.1986). Although the Moody court was comparing § 548 and the UFCA, the principle is still vital today, viz., interpretation of the virtually identical provisions of § 548(a)(1)(B) and § 5104(a)(2) should be consistent if at all possible, including how the burdens of proof are imposed and whether or when they are to be shifted.
[28] While no § 5105 claim was asserted by the trustee, I can perceive no reason why the burden(s) of proof on a § 5105 claim should not be approached the same way as in a § 5104 claim.
[29] Exhibit T-15, ¶ 2(d).
[30] Campus Crusade argues that the trustee cannot prevail under a constructive fraud theory because the trustee failed to prove that the Debtor was insolvent at the time of the Transfers. Campus Crusade also argues that the definition of insolvency for a partnership, in both the Bankruptcy Code (11 U.S.C. § 101(32)(B)) and PUFTA (12 Pa.C.S.A. § 5102(c)), requires an analysis of whether the partnership's debts are greater than the aggregate of all of the partnership's assets and the general partners' nonpartnership assets (i.e., the sum of the excess value of each general partner's nonpartnership assets over the general partner's nonpartnership debts). Id. The trustee's accountant testified that he considered Burry's assets in his analysis of the Debtor's insolvency and determined that Burry, who filed his own chapter 7 proceeding in this district, case no. 99-16038 SR, was also insolvent. (Tr. at p. 16). However, Campus Crusade argued that Edward Stillman, who claims to have been a limited partner of the Debtor, should be found to be a general partner of the Debtor, based upon his actions of signing tax returns and soliciting investments, thus requiring Stillman's assets to be included in any analysis of the Debtor's solvency. There are two problems with this argument. First, the evidence presented at trial (none of which was presented by Campus Crusade) is not sufficient to support a finding under Pennsylvania law that Stillman exercised sufficient control over the Debtor to be treated as a general partner. Block v. Commissioner of Internal Revenue, 1980 WL 4369 (U.S.Tax Ct.) 41 T.C.M. (CCH) 546 (1980); Gast v. Petsinger, 228 Pa.Super. 394, 402, 323 A.2d 371, 375 (1974). Second, the test for constructive fraud under § 5104(a)(2) of PUFTA does not require a finding of insolvency. The Transfers can be deemed constructively fraudulent, even without an analysis of the Debtor's balance sheet solvency. Under PUFTA, insolvency is a factor only under § 5105. Similarly, in Bankruptcy Code § 548, insolvency is a factor only in § 548(a)(1)(B)(ii)(I). Accordingly, both PUFTA and the Bankruptcy Code provide independent bases for avoiding constructively fraudulent transfers without proving balance sheet insolvency.
[1] The Transfers that were made from the Debtor to defendant within one year before the date of the filing of the Debtor's petition are also avoidable fraudulent transfers under 11 U.S.C. § 548(a)(1)(A) and (B).